UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

AURELIUS CAPITAL MASTER, LTD.; ACP
MASTER, LTD.; AURELIUS OPPORTUNITIES
FUND, LLC; 683 CAPITAL PARTNERS, LP;
ADONA LLC; EGOZ I LLC; EGOZ II LLC;
MASTERGEN, LLC; ERYTHRINA, LLC; AP
2016 1, LLC; AP 2014 3A, LLC; AP 2014 2, LLC;
WASO HOLDING CORPORATION; TWO SEAS
GLOBAL (MASTER) FUND LP; VIRTUAL
EMERALD INTERNATIONAL LTD. and THE
BANK OF NEW YORK MELLON, solely in its
capacity as Trustee;,

                           Plaintiffs,

              - against -

THE REPUBLIC OF ARGENTINA,

                       Defendant.

---------------------------------------------------------------x

No.

**COMPLAINT**

     Plaintiffs Aurelius Capital Master, Ltd.; ACP Master, Ltd.; Aurelius

Opportunities Fund, LLC; 683 Capital Partners, LP; Adona LLC; Egoz I LLC; Egoz II

LLC; Mastergen, LLC; Erythrina, LLC; AP 2016 1, LLC; AP 2014 3A, LLC; AP 2014

2, LLC; WASO Holding Corporation; Two Seas Global (Master) Fund LP; and Virtual

Emerald International Ltd., (collectively, the **"Individual Holders"**), in their individual

capacities as beneficial owners of interests in the Global Securities (as defined below),

and plaintiff The Bank of New York Mellon (the **"Trustee"**), solely in its capacity as

Trustee under the Trust Indenture, dated as of June 2, 2005 by and between Trustee and

the Republic of Argentina (the **"Republic"** or **"Argentina"**) as amended, restated,

supplemented, or otherwise modified from time to time (the **"Indenture"**), by their respective undersigned counsel, allege as follows, based upon knowledge as to their own acts and upon information and belief as to all others:

## NATURE OF THE ACTION

1.      This is an action for breach of contract to recover amounts due on securities issued by the Republic.  The securities are the 2005-issued U.S. Dollar-Denominated New York law GDP-Linked Securities (ISIN: US040114GM64) and the 2010-issued U.S. Dollar-Denominated New York law GDP-Linked Securities (ISIN: XS0501197262).  These securities have substantially identical terms and are referred to herein respectively as the **"2005 GDP Warrants"** and the **"2010 GDP Warrants,"** and collectively as the **"GDP Warrants"** or the **"Warrants"**.

2.      The **"Governing Documents"** for the GDP Warrants are:  (i) the Indenture (a copy of which is attached hereto as Exhibit A); (ii) the 2005 Form of Registered Global Security (the **"2005 Global Security"**), applicable to the 2005 GDP Warrants only (a copy of which is attached hereto as Exhibit B); (iii) the First Supplemental Indenture, dated as of April 30, 2010, applicable to the 2010 GDP Warrants, but not the 2005 GDP Warrants (a copy of which is attached hereto as Exhibit C); and (iv) the 2010 Form of Registered Global Security (the **"2010 Global Security"**), applicable to the 2010 GDP Warrants only (a copy of which is attached hereto as Exhibit D).  The 2005 and 2010 Global Securities are substantially the same and are referred to herein collectively as the **"Global Securities"**.[1]

---

[1] Unless otherwise defined, all capitalized terms used herein have the meanings set forth in the Global Securities.

3. Each of the Individual Holders brings this action solely on its own behalf and for its own benefit, and not for the benefit of any Holder of, or other beneficial owner of an interest in, the Global Securities.[2] The Trustee brings this action on behalf of, and for the benefit of, all Holders of the GDP Warrants.

4. Argentina issued the GDP Warrants in 2005 and 2010 as part of exchange offers pursuant to which defaulted debt previously issued by Argentina was exchanged for new securities issued by Argentina. In the exchange offers, holders of defaulted bonds received new bonds representing a steep "haircut" from the face amount (or interest coupon) of the bonds they were tendering, plus contingent debt securities consisting of the GDP Warrants or substantially identical securities denominated in other currencies. For each calendar year (what the Global Securities refer to as a Reference Year) through the earlier of 2035 or when the Payment Cap is reached, the GDP Warrants obligated Argentina to make a payment if Argentina's real GDP and real GDP growth reach contractually specified levels. If such a payment is due on account of a given Reference Year, the amount thereof is contractually prescribed and is referred to as the Payment Amount.

5. In litigation pending before this Court since 2019, certain beneficial holders of GDP Warrants have sought their share of the Payment Amount

---

[2] The Individual Holders undertake no fiduciary or other duties to each other or to any other person or entity.

due for Reference Year 2013 (the **"2013 US Litigation"**).[3]  The parties' cross-motions for summary judgment in that litigation are *sub judice*.

6.      Also in 2019, beneficial holders of GDP warrants with substantially identical terms, but denominated in Euros and governed by English law, commenced litigation (the **"English Litigation"**) before the High Court of Justice, Business and Property Courts of England & Wales (the **"English Court"**).  The English Litigation sought the payment due on these Euro-denominated warrants in respect of Reference Year 2013, as well as subsequent years where the payment conditions had been met.  In 2023, the English Court entered judgment awarding the full amount sought in respect of Reference Year 2013, and ordering, *inter alia*, the Republic to make payment for subsequent years where the payment conditions had been met.  The Republic has sought permission to appeal.

7.      In the present litigation, each Individual Holder seeks that portion of any and all Payment Amounts due for Reference Years after 2013 (including but not limited to 2015, 2017, 2018, 2021 and 2022) representing that Individual Holder's beneficial interest in the Global Securities on account of the Republic's breaches of contract as enumerated below, and the Trustee seeks any and all Payment Amounts due

---

[3] The 2013 US Litigation pending before this Court is comprised of the following actions:  (i) *Aurelius Capital Master, Ltd. v. The Republic of Argentina*, No. 19 Civ. 351 (LAP) (S.D.N.Y.); (ii) *Novoriver S.A. v. Argentine Republic*, No. 19 Civ. 9786 (LAP) (S.D.N.Y.); (iii) *ACP Master, Ltd. v. The Republic of Argentina*, No. 19 Civ. 10109 (LAP) (S.D.N.Y.); (iv) *683 Capital Partners, LP v. The Republic of Argentina*, No. 19 Civ. 10131 (LAP) (S.D.N.Y.); (v) *Adona LLC, Egoz I LLC, Egoz II LLC, Mastergen, LLC, Erythrina, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, and WASO Holding Corp. v. The Republic of Argentina*, No. 19 Civ. 11338 (LAP) (S.D.N.Y.); and (vi) *Ape Group SPA, Romano Consulting SPA, Icaro SRL, and Elazar Romano v. The Republic of Argentina*, No. 20 Civ. 10409 (LAP) (S.D.N.Y.).

for such Reference Years after 2013.  The Payment Amounts due for each of Reference Years 2015, 2017, 2018, 2021 and 2022 exceeds $1 billion, and the total due for those years is roughly $5-6 billion, not including pre- and post-judgment interest.  Additional Payment Amounts may be due for Reference Years not yet completed.

8.     The GDP Warrants set forth the terms and conditions for determining whether Argentina owes a payment to Warrant Holders for a given Reference Year.  Specifically, the GDP Warrants require the Republic to pay a Payment Amount subject to three conditions.  One condition concerns the cap on payments under the GDP Warrants.  The other two conditions compare the level and growth of Actual Real GDP to the level and growth of Base Case GDP.  The Base Case GDP figures (which, as discussed below, are subject to adjustment) are set forth in the Global Securities.

9.     The Actual Real GDP figures are supposed to be published by Argentina's statistical agency—the Instituto Nacional de Estadística y Censos (or National Institute of Statistics and Censuses), known by its Spanish acronym **INDEC**, which is part of the Ministry of Economy (**"MECON"**).  INDEC publishes Actual Real GDP measured in the constant prices of a given year.  When the GDP Warrants were issued, INDEC published Actual Real GDP measured in constant 1993 prices and consequently, 1993 was the Year of Base Prices under the Global Securities.  On March 27, 2014, Argentina announced that INDEC would change the Year of Base Prices to 2004, only publish Actual Real GDP measured in constant 2004 prices going forward, and stop publishing Actual Real GDP measured in constant 1993 prices immediately.

4854-8557-9927.1

10.     However, the GDP Warrants expressly anticipate that in the event of a change in the Year of Base Prices (a **"rebasing"**) like the one announced in March 2014, INDEC would continue to publish Actual Real GDP measured in constant 1993 prices.  When a rebasing occurs, the contract requires that the Base Case GDP figures in the Global Securities be multiplied by an adjustment fraction calculated specifically for each Reference Year—the numerator is Actual Real GDP for the Reference Year in question measured in constant prices of the new Year of Base Prices (now 2004), and the denominator is Actual Real GDP for the Reference Year in question measured in constant 1993 prices.  Because the adjustment fraction is calculated separately for each Reference Year, it ensures that a rebasing will not affect whether the payment conditions have been met, thereby protecting investors from the possibility that the Republic will try to avoid a payment otherwise due merely by rebasing.

11.     In the fall of 2013, Argentina knew that economic growth was on track to trigger a multi-billion dollar Payment Amount on the Warrants for Reference Year 2013 that would further deplete the country's already dwindling foreign currency reserves.  And by the beginning of 2014, it knew that, under the plain terms of the contract, it would owe that Payment Amount regardless of whether it rebased.  So, as its credit was downgraded and threatened with future downgrades due to losses of foreign currency reserves, the Republic took two critical steps to avoid the plain terms of the contract and its payment obligations.

12.     First, the Republic stopped publishing Actual Real GDP measured in constant 1993 prices, even though it was required by the Global Securities to calculate the adjustment fraction, and even though INDEC could have published the

figure and would have published the figure if instructed to do so.  In fact, the Republic

went a step further, and discouraged INDEC from publishing Actual Real GDP

measured in constant 1993 prices.  In doing so, the Republic knew that it was impeding

its ability to comply with the plain terms of the Global Securities, including the

determination of the payment conditions set forth therein, and frustrating Holders'

ability to establish that the payment conditions had been met and a Payment Amount

was due under the contract's plain terms.

13.     Second, the Republic ditched the adjustment fraction set forth in

the Global Securities.  Instead of calculating the adjustment fraction for each Reference

Year as required by the plain words, the Republic decided—based on nothing more than

its own self-serving views of the supposed "spirit" of the GDP Warrants—it would use

a single constant adjustment fraction based on data from one Reference Year chosen by

the Republic, and apply that constant adjustment fraction to all Reference Years.  Under

this extra-contractual constant adjustment fraction, unlike the adjustment fraction in the

Global Securities, a rebasing may affect whether the payment conditions have been met,

and post-rebasing the Republic contends no Payment Amounts are due for 2013 or any

year thereafter.

14.     In doing all of the above, the Republic breached the contract,

failed to perform calculations as required by contractual terms, committed manifest

error and acted arbitrarily, willfully and in bad faith, with full knowledge that it was not

following the plain terms of the Global Securities and that its conduct would have the

effect of destroying Holders' right to payment.  As such, the Republic has breached its

contractual obligations in several ways.

15.     The Global Securities require the Republic to obtain the consent of a supermajority of Holders before modifying the contractual payment formulas.  The Republic's use of a constant adjustment fraction does exactly that, but the Republic neither sought nor obtained the consent of GDP Warrant Holders to such a modification.  Indeed, the Republic concealed its use of the constant adjustment fraction from Warrant Holders for almost a decade until it was disclosed in the litigations related to the payment due for Reference Year 2013.

16.     Under the circumstances here, for the Reference Years at issue for which payments are due, the Republic had an implied obligation to continue the publication of Actual Real GDP measured in constant 1993 prices after a rebasing so that the data would be available to make the calculations called for by the plain terms of the Global Securities.  The English Court has found that the Republic had an implied obligation to continue publication of Actual Real GDP measured in constant 1993 prices.  Absent the continued publication, the Republic lacked the necessary data to calculate the adjustment fraction according to the plain terms of the Global Securities. The Republic could have published such data, but failed to do so, and in fact discouraged publication.

17.     Under the implied obligation of good faith and fair dealing, the Republic may not: (1) engage in conduct that would have the effect of destroying or injuring Holders' right to receive the fruits of the contract, or (ii) violate a promise that a reasonable person in the position of a Holder would be justified in understanding was included.  By discontinuing publication of Actual Real GDP measured in constant 1993 prices and using the extra-contractual constant adjustment fraction, the Republic

destroyed or injured Holders' right to receive Payment Amounts otherwise due under the contract.  Likewise, Holders were justified in understanding that the Republic impliedly promised to publish Actual Real GDP measured in constant 1993 prices after a rebasing where doing so was necessary to avoid depriving Holders of a payment that was due.

18.     Under the prevention doctrine, the Republic may not:  (1) do anything which will have the effect of destroying or injuring the right of Holders to receive the fruits of the contract or (2) act in such a way as to frustrate or prevent the occurrence of a condition precedent.  The Republic's conduct—failing to continue publication of Actual Real GDP measured in constant 1993 prices and adopting an extra-contractual constant adjustment fraction—had the effect of destroying, injuring or impeding Holders' right to receive Payment Amounts otherwise due under the contract. The Republic has also taken the position that non-publication of Actual Real GDP measured in constant 1993 prices means the conditions for payment cannot be calculated in accordance with the plain terms of the contract.  Thus, by failing to publish the necessary data, the Republic has also frustrated or prevented the occurrence of a condition precedent.

19.     Accordingly, each of the Individual Holders, solely on its own behalf and for its own benefit, and not for the benefit of any Holder of, or other beneficial owner of an interest in, the Global Securities, seeks a judgment for that portion of the Payment Amount representing such Individual Holder's beneficial interest in the Global Securities for such Reference Years where the conditions for

payment have been met.  As to such amounts due, each Individual Holder also seeks applicable pre- and post-judgment interest.

20.     And the Trustee, on behalf of all Holders of the GDP Warrants, seeks a judgment for the Payment Amount for such Reference Years where the conditions for payment have been met.  The Trustee also seeks a judgment award of its costs and expenses in investigating and prosecuting this action under the terms of the Indenture.  As to all amounts due, the Trustee seeks applicable pre- and post-judgment interest.

## THE PARTIES

21.     Individual Holder Aurelius Capital Master, Ltd. is a Cayman Islands exempted company.  It is the beneficial owner of $739,559,967 notional amount of 2005 GDP Warrants and $57,599,231 notional amount of 2010 GDP Warrants.

22.     Individual Holder ACP Master, Ltd. is a Cayman Islands exempted company.  It is the beneficial owner of $503,558,976 notional amount of 2005 GDP Warrants and $935,704,368 notional amount of 2010 GDP Warrants.

23.     Individual Holder Aurelius Opportunities Fund, LLC is a Delaware limited liability company.  It is the beneficial owner of $237,727,611 notional amount of 2005 GDP Warrants.

24.     Individual Holder 683 Capital Partners, LP is a Delaware limited partnership.  It is the beneficial owner of $341,331,000 notional amount of 2005 GDP Warrants.

25.     Individual Holder Adona LLC is a Delaware limited liability company.  It is the beneficial owner of $120,000,00 notional amount of 2005 GDP Warrants.

4854-8557-9927.1

26.     Individual Holder Egoz I LLC is a Delaware limited liability company.  It is the beneficial owner of $95,101,000 notional amount of 2005 GDP Warrants and $17,719,000 notional amount of 2010 GDP Warrants.

27.     Individual Holder Egoz II LLC is a Delaware limited liability company.  It is the beneficial owner of $59,399,000 notional amount of 2005 GDP Warrants and $9,281,000 notional amount of 2010 GDP Warrants.

28.     Individual Holder Mastergen, LLC is a Delaware limited liability company.  It is the beneficial owner of $424,654,388 notional amount of 2005 GDP Warrants and $131,100,000 notional amount of 2010 GDP Warrants.

29.     Individual Holder Erythrina, LLC is a Delaware limited liability company.  It is the beneficial owner of $47,902,911 notional amount of 2005 GDP Warrants.

30.     Individual Holder AP 2016 1, LLC is a Delaware limited liability company.  It is the beneficial owner of $93,547,937 notional amount of 2005 GDP Warrants.

31.     Individual Holder AP 2014 3A, LLC is a Delaware limited liability company.  It is the beneficial owner of $10,324,00 notional amount of 2005 GDP Warrants.

32.     Individual Holder AP 2014 2, LLC is a Delaware limited liability company.  It is the beneficial owner of $9,672,519 notional amount of 2005 GDP Warrants.

4854-8557-9927.1

33.     Individual Holder WASO Holding Corporation is an Exempted Company incorporated in the Cayman Islands.  It is the beneficial owner of $710,725,000 notional amount of 2005 GDP Warrants.

34.     Individual Holder Two Seas Global (Master) Fund LP is Cayman Islands Exempted Limited Partnership.  It is the beneficial owner of $125,545,264 notional amount of 2005 GDP Warrants and $5,000,000 notional amount of 2010 GDP Warrants.

35.     Individual Holder Virtual Emerald International Ltd. is a British Virgin Islands Exempted Limited Company.  It is the beneficial owner of $206,231,156 notional amount of 2005 GDP Warrants.

36.     In each of the Global Securities, Argentina expressly acknowledged "with respect to the right of any Holder to pursue a remedy under . . . the [Global Securities], the right of any beneficial owner of the [Global Securities] to pursue such remedy with respect to the portion of [the] Global Security that represents such beneficial owner's interest in [the] Security as if Certificated Securities had been issued to such beneficial owner."  (2005 Global Security (Exhibit B hereto) § 11; 2010 Global Security (Exhibit D hereto) § 9.)  Each Holder has the "absolute and unconditional" right to bring suit to enforce payment of any Payment Amount.  (*Id.*; Indenture (Exhibit A hereto) § 4.9.)  Accordingly, as beneficial owners, each Individual Holder has the right to bring suit for that portion of Payment Amounts due representing such Individual Holder's beneficial interest in the Global Securities.

37.     The Trustee is a New York banking corporation and serves as the Trustee for securities issued by the Republic pursuant to the Indenture, including the

GDP Warrants.  Under the terms of the Indenture and the Global Securities, it has the right to bring the claims as set forth herein on behalf of all Holders of the Global Securities.

38.     Defendant the Republic of Argentina is a foreign state as defined in 28 U.S.C. § 1603(a).

## JURISDICTION, VENUE, AND CHOICE OF LAW

39.     In the Governing Documents, Argentina explicitly and irrevocably waived sovereign immunity to the fullest extent permitted by the laws of the United States in any action with respect to the GDP Warrants.  Thus, Argentina is not entitled to immunity under 28 U.S.C. §§ 1605-1607 or under any applicable international agreement, and this Court therefore has jurisdiction pursuant to 28 U.S.C. § 1330.

40.     In the Governing Documents, Argentina irrevocably submitted to the jurisdiction of this Court over any action with respect to the GDP Warrants, and appointed Banco de la Nación Argentina, at its office at 225 Park Avenue, New York, New York 10169, as its authorized agent for service of process.

41.     In the Governing Documents, Argentina waived any objection based on venue or otherwise to any action with respect to the GDP Warrants being brought in this Court, and venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

42.     Argentina agreed that the Governing Documents shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

4854-8557-9927.1

## FACTUAL ALLEGATIONS

**A.     Payment Conditions and Payment Amount for the GDP Warrants**

43.     Under the terms of each Global Security, Argentina promised to pay the Payment Amount for any Reference Year if certain conditions are met: (i) Actual Real GDP exceeds Base Case GDP for the Reference Year (the **"Level Condition"**); (ii) Actual Real GDP Growth exceeds Base Case GDP Growth for the Reference Year (the **"Growth Condition"**); and (iii) as of the Calculation Date pertaining to the Reference Year, the aggregate of all payments made by Argentina under the Global Security, when added to the Payment Amount for such Reference Year, does not exceed the Payment Cap (the **"Payment Cap Condition"**).

44.     Payment Amount as defined in the Global Securities "means for any Payment Date, an amount equal to (i) the Available Excess GDP (converted into U.S. dollars) for the Reference Year corresponding to such Payment Date, multiplied by (ii) the notional amount of this Security outstanding as of such Payment Date. . . ." Available Excess GDP is a function of Excess GDP, which in turn is the difference between Actual Nominal GDP and Nominal Base Case GDP.  Actual Nominal GDP and Nominal Base Case GDP are, respectively, Actual Real GDP and Base Case GDP multiplied by the GDP Deflator for the Reference Year in question.

45.     For each Reference Year, calculations to determine whether a payment is due are required to be made on the Calculation Date, defined in the Global Securities as "for any Reference Year, the 1st of November of the calendar year following such Reference Year"; and payment is required to be made on the Payment Date, defined in the Global Securities as "for any Reference Year, the 15th of December of the calendar year following such Reference Year."  MECON, specifically the

14

National Office of Public Credit (**"ONCP"**), is charged with performing the calculations to determine whether a Payment Amount is due, and the amount of any such payment.

**B.**     **The Global Securities Anticipate, and the Republic Tells Investors, That INDEC Would Publish the GDP Statistics Required for the GDP Warrants**

46.     Determination of the payment conditions and calculation of the Payment Amount are based on Actual Real GDP, which the Global Securities anticipate will be published by INDEC.  Actual Real GDP is defined in the Global Securities to mean "for any Reference Year the gross domestic product of Argentina for such Reference Year measured in constant prices for the Year of Base Prices, as published by INDEC."

47.     In Argentine legal parlance, INDEC is a "deconcentrated" organ of the Argentine state.  It is a part of, and subject to hierarchical control by, MECON and, subject to direct oversight by the President.  INDEC does not have a legal identity separate from that of the Republic, and as such, INDEC's acts and omissions are the Republic's.

48.     The President of the Republic may issue instructions and orders to INDEC, require INDEC to produce statistics, and even overrule INDEC's decisions. The President also has the power (which he/she has exercised) to appoint and remove INDEC's leadership, restructure INDEC, change INDEC's position within the government, reassign INDEC personnel, make temporary appointments, and "limit" the roles of temporary appointments and INDEC's leadership.

49.     The Republic represented to investors participating in the exchange offers that INDEC "is controlled by the Argentine government" and that

INDEC would produce the GDP data required to make the calculations under the Warrants.

50.     The Republic was obligated to ensure that INDEC published the data necessary to make the calculations under the Warrants.  Indeed, absent such an obligation, the terms of the Warrants would be nonsensical because there would be contractual formulas for payment conditions and Payment Amounts, but no assurance that the inputs for such formulas would ever be available.  Moreover, if Argentina has no obligation to publish Actual Real GDP, and the absence of that data means Warrant Holders have no entitlement to payment, then the Warrants would be valueless.

C.     **The Global Securities Set Forth the Adjustment Fraction the Republic Must Apply to the Base Case GDP Figures in the Global Securities After a Rebasing**

51.     When INDEC publishes Actual Real GDP "measured in the constant prices for the Year of Base Prices" it is, in effect, applying the prices from that Year of Base Prices in order to control for changes in prices (both inflation and deflation) that otherwise occur over time.  In practice, this means that sectors of the economy are separately estimated, and the overall level of Actual Real GDP is a weighted average of the results for each sector, where the weights are a function of the prices in the chosen Year of Base Prices.  The prices, and thus the weights, are specific to the Year of Base Prices.

52.     The Global Securities recognized that when the Republic issued the GDP Warrants, INDEC was measuring Actual Real GDP in constant 1993 prices, but that it might rebase.  Thus, the Year of Base Prices as defined in the Global Securities "means the year 1993; provided that if the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar

year other than the year 1993, then the Year of Base Prices shall mean such other calendar year."

53.     Because INDEC was measuring Actual Real GDP in constant 1993 prices when the Republic issued the Warrants, the initial Base Case GDP figures in the Global Securities were also provided in constant 1993 prices.  And just as the Global Securities anticipated INDEC might change the Year of Base Prices used to measure Actual Real GDP, it required an adjustment to the initial Base Case GDP figures to account for the change.

54.     Adjustment of the initial Base Case GDP figures is necessary because changing the Year of Base Prices affects the calculation of Actual Real GDP and Actual Real GDP Growth.  Because the prices and associated weights are specific to each Year of Base Prices, Actual Real GDP and Actual Real GDP Growth for any given Reference Year will change when estimated using different base year prices and weights—*i.e.,* when measured in constant prices of a different Year of Base Prices. Even though the quantity of good and services produced in a given Reference Year does not change, rebasing may, for example, cause Actual Real GDP for a given Reference Year measured in a new Year of Base Prices to be a larger or smaller figure than the figure reported in the old Year of Base Prices (although usually larger since prices tend to rise over time), and may cause Actual Real GDP Growth also to be a larger or smaller figure.

55.     Further, the relationship between Actual Real GDP and Actual Real GDP Growth measured in the old and new Year of Base Prices is not constant from year to year.  For example, Actual Real GDP and Actual Real GDP Growth for

Reference Year 2008 measured in constant 1993 prices were 383,444 million pesos and 6.76%, respectively, but when measured in constant 2004 prices were 647,176 million pesos and 4.06%, respectively.

56.     The payment conditions and Payment Amount depend upon whether and the extent to which Actual Real GDP and Actual Real GDP Growth exceed Base Case GDP and Base Case GDP Growth, respectively.  Because changing the Year of Base Prices affects the measurement of Actual Real GDP and Actual Real GDP Growth, changing the Year of Base Prices could significantly affect the calculation of the payment conditions and Payment Amount unless there is an adjustment to the initial Base Case GDP figures that accounts for the change in the Year of Base Prices.

57.     The provisions in the Global Securities for adjusting Base Case GDP ensure that the rights of Holders to receive payments, and the obligations of Argentina to make payments, are substantially the same after a rebasing as before.  In the absence of the adjustment, Actual Real GDP and Actual Real GDP Growth would be measured in constant prices of the new Year of Base Prices, while Base Case GDP and Base Case GDP Growth would be measured in constant 1993 prices.  With the adjustment, the comparison between Actual Real GDP and Base Case GDP, and between Actual Real GDP Growth and Base Case GDP Growth, remains "apples to apples" as it was when the GDP Warrants were initially issued and the Year of Base Prices was 1993.

58.     The adjustment provision is found in the definition of Base Case GDP.  The definition of Base Case GDP contains a chart setting forth the initial Base Case GDP values in constant 1993 prices.  The chart in the Global Security for the 2005

GDP Warrants starts with Reference Year 2005.  The chart in the Global Security for

the 2010 GDP Warrants starts with Reference Year 2009, and for that year and all the

subsequent years for the duration of the Warrants, the Base Case GDP is the same for

the 2005 and 2010 GDP Warrants.

59.     In addition to the chart, the **"Adjustment Provision"** in the

definition of Base Case GDP prescribes the adjustment that must be made to the figures

in the chart when INDEC rebases:

> if the Year of Base Prices employed by INDEC for
> determining Actual Real GDP shall at any time be a
> calendar year other than the year 1993, then the Base
> Case GDP *for each Reference Year* shall be adjusted to
> reflect any such change in the Year of Base Prices by
> ***multiplying the Base Case GDP for such Reference Year***
> (as set forth in chart [contained in the Global Securities])
> ***by a fraction***, the numerator of which shall be the Actual
> Real GDP for such Reference Year measured in constant
> prices of the Year of Base Prices, and ***the denominator of***
> ***which shall be the Actual Real GDP for such Reference***
> ***Year measured in constant 1993 prices***."

(Emphasis added.)  Thus, if a change in the Year of Base Prices occurs, then by its

terms, the Adjustment Provision specifies the use of an adjustment fraction (for any

Calculation Date thereafter) comprised of a numerator—"Actual Real GDP for such

Reference Year measured in constant prices of the Year of Base Prices" [*i.e.,* the new

Year of Base Prices after rebasing]—and a denominator—"Actual Real GDP for such

Reference Year measured in constant 1993 prices."  This fraction is the **"Adjustment**

**Fraction."**  If, for example, the change in the Year of Base Prices caused Actual Real

GDP for a given Reference Year to be 50% higher than it would have been using 1993

prices, Base Case GDP for that Reference Year would be adjusted upward by 50%.

60.    The Adjustment Fraction is calculated separately for "each Reference Year" based upon GDP data for "such Reference Year."  A separate Adjustment Fraction for each Reference Year reflects the fact that the relationship between Actual Real GDP and Actual Real GDP Growth measured in the old and new Year of Base Prices is not constant from year to year.  The relationship is specific to each Reference Year, so the corresponding adjustment to Base Case GDP is also specific to that Reference Year.

61.    Under the plain language of the Global Securities, after a rebasing, when Base Case GDP figures are adjusted, the Base Case GDP Growth figures (*i.e.*, the threshold for the Growth Condition) for each year also change.  The change in Base Case GDP Growth after a rebasing is to be expected because Base Case GDP for each year is being adjusted by a different Adjustment Fraction.  If Base Case GDP Growth does not change after a rebasing, then the Growth Condition would be comparing whether Actual Real GDP Growth measured in constant prices of the new Year of Base Prices exceeds Base Case GDP Growth measured in constant 1993 prices.

62.    The Adjustment Provision provides important protection for investors in the GDP Warrants.  At the time the Warrants were issued in 2005, investors had more than five years of experience with the 1993 series; by the 2010 issuance, more than ten years.  By contrast, investors could not know when the Republic would rebase, what changes in methodology the Republic would institute as part of a rebasing, and how those changes would affect Actual Real GDP and Actual Real GDP Growth.

63.    The Adjustment Provision also prevented the Republic from using a rebasing to avoid or affect a payment that would otherwise be due—for

20

example, by rebasing at a time when it saw a payment would be due based on statistics in 1993 prices but not in the new Year of Base Prices, or by making methodological choices in connection with the adoption of a new Year of Base Prices that might avoid a payment.  If the Level Condition and Growth Condition would have been satisfied using 1993 series data before a rebasing, the Adjustment Provision ensures that those conditions would still be satisfied after a rebasing.

64.     Just as the Global Securities require that Argentina (through INDEC) publish Actual Real GDP measured in constant prices of the new Year of Base Prices for each Reference Year, it also requires that after a rebasing Argentina (through INDEC) continue to publish Actual Real GDP measured in constant 1993 prices for each Reference Year because that figure is the denominator input for the Adjustment Fraction.  Again, INDEC is a part of MECON and subject to direct oversight by the President, who may issue instructions and orders to INDEC and overrule INDEC's decisions.  INDEC had the ability, and the Republic has the power to compel INDEC, to publish Actual Real GDP measured in constant 1993 prices, and the Republic is obligated to ensure that INDEC does so, so that after a rebasing such data would be available to calculate the Adjustment Fraction.

65.     Requiring Argentina to continue publishing Actual Real GDP measured in constant 1993 prices after a rebasing is consistent with academic literature concerning securities that are linked to GDP statistics, such as the Warrants.  For example, a 2004 paper published by the U.S. Council of Economic Advisors entitled, "Growth-Indexed Bonds: A Primer" noted that "investors may worry that the revisions or any methodological changes in compiling the statistics could complicate payments

on growth-indexed debt[.]" It proposed as a possible solution: "Changes to statistical methodologies could be handled by requiring governments to keep separate GDP series calculated with the old methodology, even after adopting a new technique for other purposes, until the outstanding contracts reach maturity."

66.     Likewise a 2006 paper by Stephany Griffith-Jones and Krishnan Sharma, titled, "GDP-Indexed Bonds: Making It Happen," proposed that, "[if] there was a major change in methodology of data calculation, Governments could be required to keep separate GDP series calculated with the old methodology until the bonds mature."

67.     And a 2016 paper published by the Bank of England, entitled "Sovereign GDP-linked bonds," noted that GDP estimates "are prone to revision, rebasing, and in extreme cases manipulation," and suggested as a possible solution "requiring governments or outside agencies to keep separate GDP series based on the old method (so that payments are based on a 'notional' series rather than the one following the latest methodology)."

**D.     The Republic Embarks on a Course of Conduct in 2013-2014 to Avoid Its Payment Obligations Under the GDP Warrants**

  *1.     The Republic Knew It Would Owe a Payment for 2013 Under the Plain Language of the Global Securities that Would Further Deplete Its Already Diminished Foreign Currency Reserves*

68.     On September 27, 2013, the Director of the ONCP (the office immediately responsible for making the calculations under the GDP Warrants) sent an email to more than two dozen colleagues at MECON, including the Minister of Economy and the Secretary of Finance, warning that in light of data published by INDEC as of that date there would need to be a steep recession in the balance of 2013 to

avoid satisfying the Growth Condition and triggering a payment on the GDP Warrants for Reference Year 2013.

69.     Statistics published by INDEC after September 27, 2013 confirmed that Argentina did not go into recession in 2013.  Although Argentina never published 2013 Actual Real GDP measured in constant 1993 prices, had it done so, those figures would have shown that 2013 Actual Real GDP Growth measured in constant 1993 prices was approximately 4.9%, well above unadjusted 2013 Base Case GDP Growth of 3.22%, thereby satisfying the Growth Condition and (because the other payment conditions were also met) triggering a Payment Amount due on the Warrants for Reference Year 2013.

70.     MECON analyses from early 2014 noted that Argentina faced a payment of nearly USD $3 billion on the GDP Warrants and related securities for Reference Year 2013.  These analyses also showed that, even if INDEC were to rebase as it was planning to do, the Republic would owe a payment under the plain language of the Adjustment Provision if INDEC published 2013 Actual Real GDP measured in constant 1993 prices and the Republic applied the Adjustment Fraction.

71.     That potential payment, according to a MECON analysis, would cause a "heavy loss" in foreign currency reserves.  At that time, Argentina's foreign currency reserves were already under intense pressure, having declined from over USD $50 billion in 2011 to less than USD $30 billion by January 2014.

72.     Argentine officials at MECON and the BCRA, Argentina's central bank, closely monitored the country's foreign currency reserves.  As the President of Argentina acknowledged in a 2013 report:  "The accumulation of reserves

is the main strategy to sustain the [Argentine] peso according to the productive needs of the country.  In this way, we generate a true anti-crisis insurance that allows us to reduce external vulnerability, provide certainty to public and private investment, and develop a capital market."

73.     In February 2014, DBRS, a credit rating agency, downgraded the Republic's credit rating, noting the need to "stem reserve losses" or Argentina would face further downgrades.

**2.     *The Republic Uses the Rebasing as a Pretext to Stop Publishing the Denominator of the Adjustment Provision—Actual Real GDP Measured in Constant 1993 Prices***

74.     On March 27, 2014—at around the same time when INDEC would have been expected to publish 2013 Actual Real GDP measured in constant 1993 prices, which, when used as the denominator of the Adjustment Provision for 2013, would have confirmed that a payment was due—Minister of Economy Axel Kicillof announced that (1) the Republic was changing the Year of Base Prices from 1993 to 2004; and (2) INDEC would only publish Actual Real GDP measured in constant 2004 prices going forward, and would cease publishing Actual Real GDP measured in constant 1993 prices.

75.     That same day, INDEC reported 2013 Actual Real GDP and 2013 Actual Real GDP Growth measured in constant 2004 prices.  2013 Actual Real GDP Growth measured in constant 2004 prices was 3%.[4]  Argentina also should have

_____

[4] In 2016, INDEC substantially revised previously reported figures for Actual Real GDP measured in constant 2004 prices.  Unless otherwise noted, the revised 2004 series is referred to herein.

published 2013 Actual Real GDP measured in constant 1993 prices for the denominator
of the Adjustment Fraction, but it never did.  Had it done so, and applied the
Adjustment Provision, adjusted 2013 Base Case GDP Growth would have been below
2%, meaning that the Growth Condition had still been met and a Payment Amount was
still due for 2013, notwithstanding the rebasing.

76.     INDEC could have continued to publish Actual Real GDP
measured in constant 1993 prices after the rebasing.  The cost, time and burden of doing
so would have been relatively modest, and INDEC could have used much of the same
data gathered to publish Actual Real GDP measured in constant 2004 prices.  Had the
President directed INDEC to continue publication, it would have done so.

### 3.     The Republic Jettisons the Adjustment Fraction in the Global Securities

77.     Days after Kicillof's announcement, Guillermo Nielsen, the
former Secretary of Finance who had overseen the initial issuance of the GDP Warrants
in 2005, co-authored a newspaper article, entitled, "To Pay or Not To Pay, the Coupon
Dilemma."  The article explained that even though Base Case GDP would need to be
adjusted under the plain language of the Adjustment Provision in light of the rebasing,
that would not change whether a payment was due for Reference Year 2013.  Nielsen
and his co-author stated that "if growth for the year 2013, calculated with figures from
1993 as a basis, was 4.9%, and the new GDP figures from the years 2012 and 2013
growth was 3%, the 'basis case' with the new way of calculating would be
approximately 1.38%, significantly lower than 3%.".  Thus, the article opined, "even
with the change of basis to 2004, given the issuing standards, a growth of 3% with the
new GDP would result in the coupon needing to be paid" for Reference Year 2013.

78.     Numerous high-ranking Argentine officials, including the Chief of Cabinet and the Minister of MECON were aware of and discussed Nielsen's article. ONCP staff prepared a memorandum for the Secretary of Finance, noting that under the Adjustment Provision as explained by Nielsen, the Republic would need to publish 2013 Actual Real GDP measured in constant 1993 prices, and that if it did so, the Growth Condition would be met and a payment triggered for Reference Year 2013.

79.     On or about April 3, 2014, Jorge Capitanich, the Republic's Chief of Cabinet testified before the Argentine National Congress that Nielsen's explanation of the plain language of the Adjustment Provision was "not compatible with the one made by the National State" and that no payment would be made for Reference Year 2013 (even though the Calculation Date was months away).  He did not explain how the Republic had reached that conclusion or why it disagreed with Nielsen, and it would be almost a decade before the Republic would disclose what it had done and only after the commencement of litigation.

80.     What the Republic had done was jettison the Adjustment Fraction set forth in the Global Securities.  Instead of following the plain words and calculating an Adjustment Fraction for each Reference Year, the Republic decided that it would calculate an adjustment fraction for just one Reference Year—what it calls the "overlap year"—which the Republic contends it can select in its sole discretion.  The numerator of the Republic's fraction would be Actual Real GDP measured in the new Year of Base Prices for the "overlap year," and the denominator would be Actual Real GDP measured in constant 1993 prices for the "overlap year."  That single adjustment

fraction would be applied to all Reference Years—in effect, a constant adjustment fraction.

81.     A constant adjustment fraction assumes that the impact of a rebasing is consistent from year to year, and that the relationship between the old and new GDP series is constant over time.  That is not the case, which is why the Adjustment Fraction as written is to be calculated anew for each Reference Year.

82.     With a constant adjustment fraction, Base Case GDP Growth does not change after a rebasing.  In effect, the Republic contends that to determine whether the Growth Condition has been met, one compares Actual Real GDP Growth measured in constant prices of the new Year of Base Prices, with Base Case GDP Growth measured in constant 1993 prices.  Making that apples-to-oranges comparison, the Republic has asserted that the Growth Condition for 2013 and beyond has not been satisfied and no payments are due.

83.     In adopting a constant adjustment fraction, the Republic purported to rely upon the supposed "logic" and "spirit" of the contract, not the plain words.  Indeed, when the Republic first disclosed that it was using a constant adjustment fraction, in January 2022 as part of an amended pleading in the English Litigation, it admitted that conforming the actual words of the Global Security to a constant adjustment fraction would require adding 32 words to the Adjustment Provision.

84.     Upon information and belief, the Republic did not actually calculate or apply a constant adjustment fraction until it was performing the calculations for Reference Year 2021.  Prior to that time, it had simply compared Actual Real GDP

4854-8557-9927.1

Growth measured in constant 2004 prices to unadjusted Base Case GDP Growth measured in 1993 prices to determine that the Growth Condition had not been met.

85.     For Reference Year 2021, where the Growth Condition was met even under the Republic's extra-contractual approach (because 2021 Actual Real GDP Growth measured in constant 2004 prices exceeded unadjusted 2021 Base Case GDP Growth measured in constant 1993 prices), the Republic announced for the first time in December 2022 that it had used 2012 as the "overlap year" to determine the constant fraction.  The Republic did not announce what constant fraction it was actually using, but it purported to determine that the Level Condition had not been met.

86.     The Republic has not disclosed any of the Warrant calculations it has made with respect to Reference Year 2013 or thereafter.

87.     The English Court soundly rejected the Republic's constant fraction for a host of reasons, including:

(i)     It is atextual, and requires the addition of 32 words to the Adjustment Provision.

(ii)    The Adjustment Provision as written ensures for investors that a rebasing will not affect whether payments are due; a constant fraction does not.

(iii)   The Adjustment Fraction ensures the effect of a rebasing is properly reflected on both sides of the Level and Growth Conditions (*i.e.*, Actual Real GDP to Base Case GDP, and Actual Real GDP Growth to Base Case GDP Growth).  Otherwise, the rebasing would be reflected on the Actual Real GDP side, but not properly on the Base Case GDP side because the adjustment would not reflect the actual effect on Base Case GDP for any year other than the single overlap year used to determine the constant fraction.

(iv)    The Republic has discretion under its extra-contractual constant adjustment fraction to choose the "overlap year" for determining the constant fraction.  That decision is

significant because the choice of the "overlap year" determines the value of the constant fraction, which, in turn, affects the thresholds for the Level Condition and, consequently, the Payment Amount (if any) for every year.  The Global Securities do not mention the concept of a constant fraction at all, let alone suggest any criteria for determining what single overlap year should be used to determine a constant fraction.  Nothing in the Global Securities suggested that Holders wanted to give the Republic complete discretion to alter the Level Condition or the Payment Amount by selecting the overlap year for a constant fraction.

(v)    The Adjustment Fraction protects investors from the moral hazard that the Republic will make various choices most favorable to it.

### 4.    The Republic Discourages INDEC from Publishing Actual Real GDP Measured in Constant 1993 Prices

88.    Not only did the Republic fail to ensure that INDEC continued to publish Actual Real GDP measured in constant 1993 prices, it discouraged INDEC from doing so.  In April 2014, MECON senior officials organized and had knowledge of an unprecedented meeting with INDEC, the effect of which was to ensure that INDEC did not publish Actual Real GDP measured in constant 1993 prices.

89.    Even though Kicillof had announced that INDEC would no longer publish Actual Real GDP measured in constant 1993 prices, Nielsen had made clear the figure was necessary for the Warrant calculations.  Capitanich's congressional testimony rejected the plain language of the contract without explanation, and without addressing whether INDEC would publish 2013 Actual Real GDP measured in constant 1993 prices as Nielsen had anticipated INDEC would do.  A multi-billion-dollar payment on the Warrants hung in the balance.

90.    The MECON official responsible for making the Warrant calculations, Santiago Wright, met with the INDEC official responsible for calculating

Actual Real GDP, Gustavo Rodriguez.  Wright conferred with senior MECON officials in advance.  Wright and Rodriguez had never met before.

91.     Wright told Rodriguez what Capitanich had not told Congress or the public (and what the Republic would not disclose for almost a decade), *i.e.*, the Republic was going to jettison the Adjustment Fraction in the Global Securities and instead use a constant adjustment fraction that did not require the continued publication of Actual Real GDP measured in constant 1993 prices.

92.     Wright asked Rodriguez whether INDEC was going to publish Actual Real GDP measured in constant 1993 prices.  Rodriguez assured Wright that INDEC would not.  Wright immediately reported that information back to his superiors at MECON.

93.     Notably, before the meeting, INDEC personnel had performed their own analysis, which included a figure for 2013 Actual Real GDP measured in constant 1993 prices, confirming that after a rebasing and application of the Adjustment Provision, the Growth Condition would be met for Reference Year 2013.  But, after the meeting, INDEC personnel revised the analysis to reflect the constant adjustment fraction the Republic planned to use instead of the Adjustment Fraction in the Global Securities, and which did not require continued publication of Actual Real GDP measured in constant 1993 prices.  The revised INDEC analysis showed that no payment would be due for 2013 regardless of the overlap year and constant fraction selected.

**5.**  **For Reference Years After 2013, if the Republic Had Published Actual Real GDP Measured in Constant 1993 Prices and Applied the Adjustment Fraction, It Would Have Been Clear That Payment Amounts Were Due**

94.     For Reference Years after 2013, INDEC did not publish Actual Real GDP measured in constant 1993 prices.  The Republic also failed to apply the Adjustment Provision set forth in the Global Securities.

95.     The Republic did not make a payment under the GDP Warrants for any Reference Year after 2013.  For each Reference Year from 2014 through 2020, the Republic announced that no payment was due because Actual Real GDP Growth for year in question did not exceed Base Case GDP Growth—in other words, because the Growth Condition was not satisfied.  For Reference Year 2021, the Republic announced that the Growth Condition had been met, but the Level Condition (whether Actual Real GDP exceeded Base Case GDP) had not been satisfied.

96.     However, the Republic did not calculate Base Case GDP and Base Case GDP Growth (which are needed to determine, respectively, satisfaction of the Level and Growth Conditions) for those Reference Years in accordance with the Global Securities because the Republic failed to publish Actual Real GDP measured in constant 1993 prices for those Reference Years, which is a necessary input for calculating the Adjustment Fraction required by the Global Securities.

97.     Instead of publishing Actual Real GDP measured in constant 1993 prices, applying the Adjustment Fraction and calculating Base Case GDP and Base Case GDP Growth for Reference Years 2014 through 2022 in accord with the Global Securities, the Republic applied its extra-contractual constant adjustment fraction.

31

98.     If the Republic had published Actual Real GDP measured in constant 1993 prices for Reference Years 2014-2022, applied the Adjustment Fraction and calculated Base Case GDP and Base Case GDP Growth in accord with the Global Securities, it would have been apparent for several of those years that the payment conditions were satisfied, and that the Republic owed Payment Amounts.

99.     While discovery will presumably provide additional relevant information, the publicly available data published by the Republic demonstrates that the Republic owed Payment Amounts for some, if not all, Reference Years after 2013.

100.    For the period from 1Q 2004 through 3Q 2013 (the **"Overlap Period"**), the Republic published two series of quarterly real GDP data—one measured in constant 1993 prices and the other in constant 2004 prices.  This quarterly data included information for the whole economy and each sector or component of the economy.  By comparing these two series of GDP data over the Overlap Period, several noteworthy observations can be made.

101.    During the Overlap Period, the 1993 series reported higher growth in Actual Real GDP than the 2004 series.  For the Overlap Period as a whole, cumulative growth in Actual Real GDP was much higher in the 1993 series than the 2004 series—94.3% v. 56.7%, a difference of approximately 3.9 percentage points per annum.  For seven of the nine Reference Years in the Overlap Period where an annual growth rate can be calculated (including the most recent three), Actual Real GDP Growth was higher in the 1993 series than the 2004 series.  In each of Reference Years 2011 and 2012, Actual Real GDP Growth was 2.9 percentage points greater in the 1993 series than in the 2004 series.  And, as the English Court determined in the English

Litigation, taking into account EMAE data (an index of economic activity also published by INDEC) for the fourth quarter of 2013, the 1993 series outperformed the 2004 series by 2.5 percentage points in Reference Year 2013, meaning that the differential over the last three Reference Years of the Overlap Period averaged 2.8 percentage points.

102.    Unadjusted Base Case GDP Growth for the years after 2013 was 3%.  The effect of the Adjustment Fraction is that if Actual Real GDP Growth measured in constant 1993 prices exceeded 3%, the Growth Condition would have been satisfied. This condition was obviously satisfied for at least four years at issue in this case. Actual Real GDP Growth measured in constant 2004 prices for Reference Years 2015, 2017, 2021, and 2022 was 2.459%, 2.854%, 10.398%, and 4.956%, respectively.  Given that, as quantified above, Actual Real GDP Growth was much higher under the 1993 series than the 2004 series during the Overlap Period, Actual Real GDP Growth measured in constant 1993 prices for 2015, 2017, 2021, and 2022 would have been far above 3% if the 1993 series data had been published.

103.    Likewise, the effect of the Adjustment Fraction is that if Actual Real GDP measured in constant 1993 prices exceeded unadjusted Base Case GDP, then the Level Condition would have been satisfied.  Even if, following the Overlap Period, Actual Real GDP Growth under the 1993 series were the same as under the 2004 series, Actual Real GDP measured in constant 1993 prices would have exceeded unadjusted Base Case GDP for Reference Years 2015, 2017, 2018, and 2022 and fallen just short of that in 2021.  But Actual Real GDP Growth was almost surely much higher under the 1993 series than the 2004 series following the Overlap Period, as it was during the

Overlap Period; so Plaintiffs believe the Level Condition was met in all five of those Reference Years, among others at issue in this case.

104.    While the 1993 and 2004 series report different amounts of Actual Real GDP and Actual Real GDP Growth, there is a high degree of statistical correlation between the series.  Using data published by the Republic for the two series and employing established and accepted statistical techniques, including regression analyses, there is a strong basis upon which to estimate what Actual Real GDP and Actual Real GDP Growth measured in constant 1993 prices would have been for Reference Years after 2013.

105.    Applying these established and accepted statistical techniques, Actual Real GDP and Actual Real GDP Growth measured in constant 1993 prices were such that the Growth and Level Conditions were satisfied for several Reference Years after 2013, including 2015, 2017, 2018, 2021, and 2022.

106.    Applying those techniques, the Payment Amounts due for each of Reference Years 2015, 2017, 2018, 2021 and 2022 range from approximately $1 to $1.6 billion, and the total amount due is roughly $5-6 billion, not including pre- and post-judgment interest.  Additional Payment Amounts may be due for Reference Years not yet completed.

107.    As of the Calculation Dates for Reference Years 2015, 2017, 2018, 2021, and 2022, the aggregate of payments made by Argentina under the Global Securities (approximately $2.9 billion) when added to the Payment Amount due for each such Reference Year (approximately $1-1.6 billon) does not exceed the Payment

34

Cap (approximately $8.1 billion), and thus the Payment Cap condition was also satisfied for each of those Reference Years.

## CLAIMS FOR RELIEF

### COUNT ONE
### (BY THE INDIVIDUAL HOLDERS)

108.    The Individual Holders repeat and re-allege the allegations of paragraphs 1 through 107.

109.    The Individual Holders have the right to bring suit for that portion of Payment Amounts due representing their respective interests in the Global Securities, and assert the claims set forth in this Count One, pursuant to Section 11 of the 2005 Global Security, Section 9 of the 2010 Global Security and Section 4.9 of the Indenture.

110.    The Republic has breached its contractual obligations under the Global Securities to the Individual Holders in at least four ways.

111.    *First*, the Republic breached the Modifications Provision of the Global Securities—Section 22 of the 2005 Global Security and Section 20 of the 2010 Global Security.  That provision requires that modifications to certain "Reserved Matters," such as a "change [to] the method of calculation of the Payment Amounts," receive the consent of 75% of Warrant Holders.

112.    By jettisoning the Adjustment Fraction set forth in the Global Securities for its extra-contractual constant adjustment fraction, the Republic changed the determination of Base Case GDP after a rebasing.  And since, Base Case GDP is a necessary input in the calculation of the Payment Amount under the Global Securities, the Republic's use of the constant fraction constitutes a "change [to] the method of

calculation of the Payment Amounts." It, therefore, is a Reserved Matter that required approval by at least 75% of Warrant Holders.

113. However, the Republic never sought or obtained the consent of Warrant Holders to modify the Global Securities pursuant to the Modifications Provision (or otherwise) and replace the Adjustment Fraction with the Republic's extra-contractual constant fraction. It, therefore, breached the Global Securities' Modifications Provision.

114. *Second*, the Republic breached its implied obligation to ensure that INDEC published Actual Real GDP measured in constant 1993 prices after a rebasing. The Global Securities anticipate that INDEC will do so and INDEC could have done so. INDEC is part of the Republic, the Republic told investors that it controlled INDEC and that INDEC would publish data called for by the Global Securities. The Republic could have ensured that INDEC published Actual Real GDP measured in constant 1993 prices, and INDEC would have done so if the President had directed it to do so.

115. Absent an obligation to publish, the terms of the Warrants would be nonsensical because there would be contractual formulas for payment conditions and amounts but no assurance that the inputs for such formulas would ever be available. Moreover, if Argentina has no obligation to publish Actual Real GDP, and the absence of that data means Warrant Holders have no entitlement to payment, then the Warrants would be valueless.

116. The Republic breached its implied obligation to publish by not ensuring that INDEC continued to publish Actual Real GDP measured in constant 1993

4854-8557-9927.1

prices after the rebasing.  In fact, the Republic discouraged INDEC from publishing to avoid its payment obligations.

117.    *Third*, the Republic breached the covenant of good faith and fair dealing implied under New York law.  Under the implied obligation of good faith and fair dealing, the Republic may not: (1) engage in conduct that would have the effect of destroying or injuring Holder's right to receive the fruits of the contract, or (ii) violate a promise that a reasonable person in the position of a Holder would be justified in understanding was included.

118.    By failing to ensure—in fact discouraging—continued publication of Actual Real GDP measured in constant 1993 prices where it could have and adopting an extra-contractual constant adjustment fraction, the Republic destroyed Holders' right to receive Payment Amounts otherwise due under the contract.

119.    Likewise, Holders were justified in understanding that the Republic impliedly promised to ensure (and not discourage) publication of Actual Real GDP measured in constant 1993 prices after a rebasing where doing so was necessary to avoid depriving Holders of a payment that was due.

120.    *Fourth*, under the prevention doctrine, the Republic may not: (1) do anything which will have the effect of destroying or injuring the right of Holders to receive the fruits of the contract or (2) act in such a way as to frustrate or prevent the occurrence of a condition precedent.

121.    The Republic's conduct—failing to ensure (and discouraging) continued publication of Actual Real GDP measured in constant 1993 prices where it could have and adopting an extra-contractual constant adjustment fraction—had the

effect of destroying, injuring, or impeding Holders' right to receive Payment Amounts otherwise due under the contract.

122.    The Republic has also taken the position that non-publication of Actual Real GDP measured in constant 1993 prices means the conditions for payment cannot be calculated in accord with the plain terms of the contract.  Thus, by failing to ensure publication of the data where it could have, the Republic has also acted in such a way as to frustrate or prevent the occurrence of a condition precedent.

123.    Because Argentina failed to ensure publication of this figure, the Individual Holders (and Trustee) are relieved of any obligation to rely upon the missing data to establish the Republic's payment obligations under the GDP Warrants.

124.    In doing all of the above, Argentina breached the contract, failed to perform calculations as required by contractual terms, committed manifest error and acted arbitrarily, willfully, and in bad faith.  It knew that a payment would be due for 2013 if INDEC continued publication of Actual Real GDP measured in constant 1993 prices and it followed the plain language of the Global Securities, and such payment would have a significant negative impact on its foreign currency reserves and credit rating.  It knew that the natural and unavoidable consequence of failing to ensure that INDEC continued publication of Actual Real GDP measured in constant 1993 prices, discouraging INDEC from doing so, jettisoning the plain language of the Global Securities mandating the application of the Adjustment Fraction, and adopting its extra-contractual constant fraction, would be to frustrate the right of Holders to payment under the terms of the contract.

125.    If the Republic had not breached its contractual obligations, if INDEC had continued to publish Actual Real GDP measured in constant 1993 prices, and if the Republic had followed the plain terms of the Global Securities, it would have been apparent that the payment conditions had been met and the Republic owed a Payment Amount for one or more Reference Years after 2013.  The Republic has breached its contractual obligations by failing to make such payments and it owes each of the Individual Holders that portion of the Payment Amounts due representing such Individual Holder's interest in the Global Securities.

## COUNT TWO
## (BY THE TRUSTEE)

126.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 125.

127.    As set forth above, Argentina breached its contractual obligations under the Global Securities in at least four ways.

128.    If the Republic had not breached its contractual obligations as set forth above, if INDEC had continued to publish Actual Real GDP measured in constant 1993 prices, and if the Republic had followed the plain terms of the Global Securities, it would have been apparent that the payment conditions had been met and the Republic owed a Payment Amount for one or more Reference Years after 2013.  The Republic has breached its contractual obligations by failing to make such payments and it owes the Trustee the full Payment Amounts for such Reference Years.

4854-8557-9927.1

## PRAYER FOR RELIEF

WHEREFORE, each Individual Holder requests the entry of a judgment

against the Republic as follows:

(a)    Awarding such Individual Holder a sum equal to that portion of the Payment Amount representing such Individual Holder's interest in the Global Securities for any Reference Years after 2013 for which the payment conditions would have been met but for the Republic's breaches, plus applicable pre-judgment interest through entry of judgment and post-judgment interest thereafter, as applicable; and

(b)    Granting such Individual Holder such other relief as the Court deems just and proper.

WHEREFORE, the Trustee requests the entry of a judgment against the

Republic as follows:

(a)    Awarding the Trustee a sum equal to the Payment Amounts for any Reference Years after 2013 for which the payment conditions would have been met but for the Republic's breaches, plus applicable pre-judgment interest through entry of judgment and post-judgment interest thereafter, as applicable;

(b)    Awarding the Trustee, pursuant to Section 5.6(a) of the Indenture, "compensation as agreed between the Republic and the Trustee . . . and all documented expenses, disbursements and advances reasonably incurred . . . or made by or on behalf of [the Trustee] . . . in accordance with any provisions of [the] Indenture (including the compensation, documented expenses and disbursements reasonably incurred . . . of its counsel and of all agents and other persons not regularly in its employ)," plus applicable pre-judgment interest through entry of judgment and post-judgment interest thereafter, as applicable;

(c)    Awarding the Trustee, pursuant to Section 5.6(b) of the Indenture, a sum sufficient "to indemnify the Trustee . . . for, and to hold it harmless against, any loss, liability or expense incurred by the Trustee . . . arising out of or in connection with the acceptance or administration of [the] Indenture or the trusts [t]hereunder and its duties [t]hereunder, including the documented costs and expenses reasonably incurred . . . of defending itself against or investigating any claim of liability with respect to the foregoing," plus applicable pre-judgment

4854-8557-9927.1

interest through entry of judgment and post-judgment interest thereafter, as applicable;

(d)    Awarding the Trustee, pursuant to Section 4.4(a) of the Indenture, a sum "sufficient to cover the [Trustee's] documented costs and expenses of collection and other liabilities reasonably incurred, including reasonable compensation to the Trustee and . . . [its] agents, attorneys and counsel, and any documented expenses and liabilities reasonably incurred, and all documented advances reasonably made, by the Trustee," plus applicable pre-judgment interest through entry of judgment and post-judgment interest thereafter, as applicable; and

(e)    Granting the Trustee such other relief as the Court deems just and proper.

Dated:   New York, New York
          December 13, 2023

| FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP | PERKINS COIE LLP |
|---|---|
| By: *Edward A. Friedman*<br>    Edward A. Friedman<br>    Daniel B. Rapport<br>    Michael S. Palmieri | By: _____<br>    Matthew M. Riccardi<br>    H. Rowan Gaither IV |
| 7 Times Square<br>New York, New York 10036<br>(212) 833-1100 | 1155 Ave. of the Americas, 22nd Floor<br>New York, New York 10036-2711<br>(212) 530-1800 |
| *Attorneys for Plaintiffs and Individual Holders Aurelius Capital Master, Ltd.; ACP Master, Ltd.; and Aurelius Opportunities Fund, LLC and Plaintiff The Bank of New York Mellon, solely in its capacity as Trustee* | *Attorneys for Plaintiff and Individual Holder 683 Capital Partners, LP* |

| LATHAM & WATKINS LLP |  |
|---|---|
| By: _____<br>Matthew S. Salerno<br>Ryan M. Schachne<br>1271 Avenue of the Americas<br>New York, New York 10020<br>(212) 906-1200<br><br>*Attorneys for Plaintiffs and Individual Holders Adona LLC, Egoz I LLC, Egoz II LLC, Mastergen, LLC, Erythrina, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, WASO Holding Corporation, Two Seas Global (Master) Fund LP, and Virtual Emerald International Ltd.* |  |