UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
AURELIUS CAPITAL MASTER, LTD.; ACP         :
MASTER, LTD.; AURELIUS OPPORTUNITIES :
FUND, LLC; 683 CAPITAL PARTNERS, LP;       :
ADONA LLC; EGOZ I LLC; EGOZ II LLC;        :      No. 1:23-CV-10838 (LAP)
MASTERGEN, LLC; ERYTHRINA, LLC; AP       :      Hon. Loretta A. Preska
2016 1, LLC; AP 2014 3A, LLC; AP 2014 2, LLC;:
WASO HOLDING CORPORATION; TWO SEAS:      **AMENDED COMPLAINT**
GLOBAL (MASTER) FUND LP; VIRTUAL           :
EMERALD INTERNATIONAL LTD. and THE      :
BANK OF NEW YORK MELLON, solely in its    :
capacity as Trustee,                                        :
                                                            :
                          Plaintiffs,                       :
                                                            :
              - against -                                   :
                                                            :
THE REPUBLIC OF ARGENTINA,                   :
                                                            :
                          Defendant.                        :
                                                            :
                                                            :
------------------------------------------------------------x

        Plaintiffs Aurelius Capital Master, Ltd.; ACP Master, Ltd.; Aurelius

Opportunities Fund, LLC; 683 Capital Partners, LP; Adona LLC; Egoz I LLC; Egoz II

LLC; Mastergen, LLC; Erythrina, LLC; AP 2016 1, LLC; AP 2014 3A, LLC; AP 2014

2, LLC; WASO Holding Corporation; Two Seas Global (Master) Fund LP; and Virtual

Emerald International Ltd. (collectively, the **"Individual Holders"**), in their individual

capacities as beneficial owners of interests in the Global Securities (as defined below),

and plaintiff The Bank of New York Mellon (the **"Trustee"**), solely in its capacity as

Trustee under the Trust Indenture, dated as of June 2, 2005 by and between Trustee and

the Republic of Argentina (the **"Republic"** or **"Argentina"**) as amended, restated,

4859-4921-1370.1

supplemented, or otherwise modified from time to time (the **"Indenture"**), by their respective undersigned counsel, allege as follows, based upon knowledge as to their own acts and upon information and belief as to all others:

## NATURE OF THE ACTION

1.     This is an action for breach of contract to recover amounts due on securities issued by the Republic.  The securities are the 2005-issued U.S. Dollar-Denominated New York law GDP-Linked Securities (ISIN: US040114GM64) and the 2010-issued U.S. Dollar-Denominated New York law GDP-Linked Securities (ISIN: XS0501197262).  These securities have substantially identical terms and are referred to herein respectively as the **"2005 GDP Securities"** and the **"2010 GDP Securities,"** and collectively as the **"GDP Securities"** or the **"Securities"**.

2.     The **"Governing Documents"** for the GDP Securities are:  (i) the Indenture (a copy of which is attached hereto as Exhibit A); (ii) the 2005 Form of Registered Global Security (the **"2005 Global Security"**), applicable to the 2005 GDP Securities only (a copy of which is attached hereto as Exhibit B); (iii) the First Supplemental Indenture, dated as of April 30, 2010, applicable to the 2010 GDP Securities, but not the 2005 GDP Securities (a copy of which is attached hereto as Exhibit C); and (iv) the 2010 Form of Registered Global Security (the **"2010 Global Security"**), applicable to the 2010 GDP Securities only (a copy of which is attached hereto as Exhibit D).  The 2005 and 2010 Global Securities are substantially the same and are referred to herein collectively as the **"Global Securities"**.[1]

---

[1] Unless otherwise defined, all capitalized terms used herein have the meanings set forth in the Global Securities.

3.      Each of the Individual Holders brings this action solely on its own behalf and for its own benefit, and not for the benefit of any Holder of, or other beneficial owner of an interest in, the Global Securities.[2]  The Trustee brings this action on behalf of, and for the benefit of, all Holders of the GDP Securities.

4.      Argentina issued the GDP Securities in 2005 and 2010 as part of exchange offers pursuant to which defaulted debt previously issued by Argentina was exchanged for new securities issued by Argentina.  In the exchange offers, holders of defaulted bonds received new bonds representing a steep "haircut" from the face amount (or interest coupon) of the bonds they were tendering, plus contingent debt securities consisting of the GDP Securities or substantially identical securities denominated in other currencies.  For each calendar year (what the Global Securities refer to as a Reference Year) through the earlier of 2035 or when the Payment Cap is reached, the GDP Securities obligated Argentina to make a payment if Argentina's real GDP and real GDP growth reach contractually specified levels.  If such a payment is due on account of a given Reference Year, the amount thereof is contractually dictated and is referred to as the Payment Amount.

5.      In 2019, certain beneficial owners of GDP Securities commenced litigation in this Court seeking their shares of the Payment Amount due for Reference Year 2013 (the **"2013 US Litigation"**).[3]  In March 2024, this Court granted the

---

[2] The Individual Holders undertake no fiduciary or other duties to each other or to any other person or entity.

[3] Before this Court, the 2013 US Litigation comprised the following actions:
(i) *Aurelius Capital Master, Ltd. v. The Republic of Argentina*, No. 19 Civ. 351 (LAP)

Republic's motion for summary judgment and dismissed those beneficial owners' claims as barred by the "no action" clauses in the GDP Securities' governing documents, without reaching the merits of their claims.  The beneficial owners' timely appeals are currently pending in the United States Court of Appeals for the Second Circuit.  Additionally, after having complied with the "no action" clauses, on September 25, 2024, the beneficial owners who were plaintiffs in the 2013 US Litigation filed an action in this Court pursuant to Section 205(a) of the New York Civil Practice Law and Rules, reasserting claims for the Payment Amount for Reference Year 2013.

> 6.    Also in 2019, certain beneficial owners of GDP Securities with substantially identical terms, but denominated in Euros and governed by English law, commenced litigation (the **"English Litigation"**) before the High Court of Justice, Business and Property Courts of England & Wales (the **"English Court"**).  The English Litigation sought relief both with respect to all outstanding Euro-denominated GDP Securities (as the Trustee seeks in the present action with respect to all U.S. Dollar-denominated GDP Securities) and with respect to the subset thereof beneficially held by the beneficial owners bringing the suit (as the Individual Holders seek in the present action and various beneficial owners seek in the 2013 US Litigation).  The English

---

(S.D.N.Y.); (ii) *Novoriver S.A. v. Argentine Republic*, No. 19 Civ. 9786 (LAP) (S.D.N.Y.); (iii) *ACP Master, Ltd. v. The Republic of Argentina*, No. 19 Civ. 10109 (LAP) (S.D.N.Y.); (iv) *683 Capital Partners, LP v. The Republic of Argentina*, No. 19 Civ. 10131 (LAP) (S.D.N.Y.); (v) *Adona LLC, Egoz I LLC, Egoz II LLC, Mastergen, LLC, Erythrina, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, and WASO Holding Corp. v. The Republic of Argentina*, No. 19 Civ. 11338 (LAP) (S.D.N.Y.); and (vi) *Ape Group SPA, Romano Consulting SPA, Icaro SRL, and Elazar Romano v. The Republic of Argentina*, No. 20 Civ. 10409 (LAP) (S.D.N.Y.).

Litigation sought the Payment Amount due on these Euro-denominated GDP Securities in respect of Reference Year 2013 (using the identical data and methodology asserted in the 2013 US Litigation), as well as subsequent years where the payment conditions had been met.  In 2023, the English Court entered judgment in favor of the beneficial owners—both as to the entirety of the Euro-denominated GDP Securities and as to their individual claims on account of their own beneficial holdings—awarding the full Payment Amount sought in respect of Reference Year 2013, and ordering, *inter alia*, the Republic to make payment for subsequent years where the payment conditions had been met.  In 2024, the English Court of Appeal unanimously affirmed that judgment.  As of the date of this Amended Complaint, the Republic is seeking discretionary review by the United Kingdom's Supreme Court.

       7.     In the present litigation, each Individual Holder seeks that portion of any and all Payment Amounts due for Reference Years after 2013 (including but not limited to 2015, 2017, 2018, 2021 and 2022) representing that Individual Holder's beneficial interest in the Global Securities on account of the Republic's breaches of contract as enumerated below, and the Trustee seeks any and all Payment Amounts due for such Reference Years after 2013.  The Payment Amounts due for each of Reference Years 2015, 2017, 2018, 2021 and 2022 exceeds $1 billion, and the total due for those years is roughly $5-6 billion, not including pre- and post-judgment interest.  Additional Payment Amounts may be due for Reference Years not yet completed.

       8.     The GDP Securities set forth the terms and conditions for determining whether Argentina owes a payment to Holders for a given Reference Year.  Specifically, the GDP Securities require the Republic to pay a Payment Amount subject

to three conditions.  One condition concerns the cap on payments under the GDP Securities.  The other two conditions compare the level and growth of Actual Real GDP to the level and growth of Base Case GDP.  The Base Case GDP figures (which, as discussed below, are subject to adjustment) are set forth in the Global Securities.

9.    The Actual Real GDP figures are supposed to be published by Argentina's statistical agency—the Instituto Nacional de Estadística y Censos (or National Institute of Statistics and Censuses), known by its Spanish acronym **INDEC**, which is part of the Ministry of Economy (**"MECON"**).  INDEC publishes Actual Real GDP measured in the constant prices of a given year.  When the GDP Securities were issued, INDEC published Actual Real GDP measured in constant 1993 prices and consequently, 1993 was the Year of Base Prices under the Global Securities.  On March 27, 2014, Argentina announced that INDEC would change the Year of Base Prices to 2004, only publish Actual Real GDP measured in constant 2004 prices going forward, and stop publishing Actual Real GDP measured in constant 1993 prices immediately.

10.    However, the GDP Securities expressly anticipate that in the event of a change in the Year of Base Prices (a **"rebasing"**) like the one announced in March 2014, INDEC would continue to publish Actual Real GDP measured in constant 1993 prices.  When a rebasing occurs, the contract requires that the Base Case GDP figures in the Global Securities be multiplied by an adjustment fraction calculated specifically for each Reference Year—the numerator is Actual Real GDP for the Reference Year in question measured in constant prices of the new Year of Base Prices (now 2004), and the denominator is Actual Real GDP for the Reference Year in question measured in constant 1993 prices.  Because the adjustment fraction is

6

calculated separately for each Reference Year, it ensures that a rebasing will not affect whether the payment conditions have been met, thereby protecting investors from the possibility that the Republic will try to avoid a payment otherwise due merely by rebasing.

11.    In the fall of 2013, Argentina knew that economic growth was on track to trigger a multi-billion dollar Payment Amount on the Securities for Reference Year 2013 that would further deplete the country's already dwindling foreign currency reserves.  And by the beginning of 2014, it knew that, under the plain terms of the contract, it would owe that Payment Amount regardless of whether it rebased.  So, as its credit was downgraded and threatened with future downgrades due to losses of foreign currency reserves, the Republic took two critical steps to avoid the plain terms of the contract and its payment obligations.

12.    First, the Republic stopped publishing Actual Real GDP measured in constant 1993 prices, even though it was required by the Global Securities to calculate for each Reference Year an adjustment fraction, and even though INDEC could have published the figure for Actual Real GDP in constant 1993 prices and would have published the figure if instructed to do so.  In fact, the Republic went a step further.  In the early months of 2014, the Republic had a working estimate of Actual Real GDP measured in constant 1993 prices for the full year 2013 that showed a payment was due.  Notwithstanding that INDEC had already published figures for the first three quarters of 2013, and normally would have published Actual Real GDP for the full year by March 2014, the Republic discouraged INDEC from publishing Actual Real GDP measured in constant 1993 prices for the full year 2013.  In doing so, the

7

Republic knew that it was impeding its ability to comply with the plain terms of the Global Securities, including the determination of the payment conditions set forth therein, and frustrating Holders' ability to establish that the payment conditions had been met and a Payment Amount was due under the contract's plain terms.

13.     Second, the Republic ditched the requirement set forth in the Global Securities that an adjustment fraction be calculated for each Reference Year. Instead of calculating the adjustment fraction for each Reference Year as required by the plain words, the Republic decided—based on nothing more than its own self-serving views of the supposed "spirit" of the GDP Securities—it would use a single constant adjustment fraction based on data from one Reference Year chosen by the Republic, and apply that constant adjustment fraction to all Reference Years.  Under this extra-contractual constant adjustment fraction, unlike the annual adjustment fraction required by the Global Securities, a rebasing may affect whether the payment conditions have been met, and post-rebasing the Republic contends no Payment Amounts are due for 2013 or any year thereafter.

14.     In doing all of the above, the Republic breached the contract, failed to perform calculations as required by contractual terms, committed manifest error and acted arbitrarily, willfully and in bad faith, with full knowledge that it was not following the plain terms of the Global Securities and that its conduct would have the effect of destroying Holders' right to payment.  As such, the Republic has breached its contractual obligations in several ways.

15.     The Global Securities require the Republic to obtain the consent of a supermajority of Holders before modifying the contractual payment formulas.  The

Republic's use of a constant adjustment fraction does exactly that, but the Republic neither sought nor obtained the consent of GDP Security Holders to such a modification. Indeed, the Republic concealed its use of the constant adjustment fraction from Holders for almost a decade until it was disclosed in the litigations related to the payment due for Reference Year 2013.

16.     Under the circumstances here, for the Reference Years at issue for which payments are due, the Republic had an obligation to continue the publication of Actual Real GDP measured in constant 1993 prices after a rebasing, and to perform the calculations with that data as called for by the plain terms of the Global Securities. The English Court has found that the Republic had an implied obligation to continue publication of Actual Real GDP measured in constant 1993 prices. Absent the continued publication, the Republic lacked the necessary data to calculate the yearly adjustment fractions according to the plain terms of the Global Securities. The Republic could have published such data and performed the calculations called for by the Global Securities, but failed to do so, and in fact discouraged publication.

17.     Under the implied obligation of good faith and fair dealing, the Republic may not: (1) engage in conduct that would have the effect of destroying or injuring Holders' right to receive the fruits of the contract, or (ii) violate a promise that a reasonable person in the position of a Holder would be justified in understanding was included. By discontinuing publication of Actual Real GDP measured in constant 1993 prices, using the extra-contractual constant adjustment fraction, and failing to perform the contractually-required calculations, the Republic destroyed or injured Holders' right to receive Payment Amounts otherwise due under the contract. Likewise, Holders were

justified in understanding that the Republic impliedly promised to publish Actual Real GDP measured in constant 1993 prices after a rebasing where doing so was necessary to perform the calculations mandated by the Global Securities, and avoid depriving Holders of a payment that was due.

18.    Under the prevention doctrine, the Republic may not:  (1) do anything which will have the effect of destroying or injuring the right of Holders to receive the fruits of the contract or (2) act in such a way as to frustrate or prevent the occurrence of a condition precedent.  The Republic's conduct—failing to continue publication of Actual Real GDP measured in constant 1993 prices, adopting an extra-contractual constant adjustment fraction, and failing to perform the contractually-required calculations—had the effect of destroying, injuring or impeding Holders' right to receive Payment Amounts otherwise due under the contract.  The Republic has also taken the position that non-publication of Actual Real GDP measured in constant 1993 prices means the conditions for payment cannot be calculated in accordance with the plain terms of the contract.  Thus, by failing to publish the necessary data, the Republic has also frustrated or prevented the occurrence of a condition precedent.

19.    The Republic's campaign to shirk its payment obligations under the Securities took a new turn months after Plaintiffs commenced this Action.  In July 2024, supposedly in response to an order of the English Court, the Republic published figures that it now asserts are the missing contractually required data.  Unsurprisingly, those figures—which the Republic published just one day before it moved to dismiss the original Complaint in this Action—purported to absolve the Republic of a payment obligation for any Reference Year even if the Court applies the plain language of the

Global Securities, rather than the Republic's extra-contractual constant adjustment fraction. The Republic's publication of these newly-minted statistics—which the Republic concedes are not "meaningful" and do not "meet the minimum quality standards required of official statistics from a national statistical institute"—not only fails to relieve it of its payment obligations, but further evidences its misconduct and flagrant attempts to trample on the rights of Holders.

20.     The statistics are plainly ***not*** the contractually-required input of Actual Real GDP measured in constant 1993 prices. By seeking to replace the data required by the Global Securities with alternative figures, the Republic has improperly attempted to modify the contractual calculations, breached its obligation to publish and use the necessary GDP data on a timely basis, and sought to destroy Holders' right to receive payments due to them.

21.     Accordingly, each of the Individual Holders, solely on its own behalf and for its own benefit, and not for the benefit of any Holder of, or other beneficial owner of an interest in, the Global Securities, seeks a judgment for that portion of the Payment Amount representing such Individual Holder's beneficial interest in the Global Securities for such Reference Years where the conditions for payment have been met. As to such amounts due, each Individual Holder also seeks applicable pre- and post-judgment interest.

22.     And the Trustee, on behalf of all Holders of the GDP Securities, seeks a judgment for the Payment Amount for such Reference Years where the conditions for payment have been met. The Trustee also seeks a judgment award of its costs and expenses in investigating and prosecuting this action under the terms of the

11

Indenture.  As to all amounts due, the Trustee seeks applicable pre- and post-judgment interest.

## THE PARTIES

23.     Individual Holder Aurelius Capital Master, Ltd. is a Cayman Islands exempted company.  It is the beneficial owner of $739,559,967 notional amount of 2005 GDP Securities and $57,599,231 notional amount of 2010 GDP Securities.  The management company for Individual Holder Aurelius Capital Master, Ltd. was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

24.     Individual Holder ACP Master, Ltd. is a Cayman Islands exempted company.  It is the beneficial owner of $503,558,976 notional amount of 2005 GDP Securities and $935,704,368 notional amount of 2010 GDP Securities.  The management company for Individual Holder ACP Master, Ltd. was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

25.     Individual Holder Aurelius Opportunities Fund, LLC is a Delaware limited liability company.  It is the beneficial owner of $237,727,611 notional amount of 2005 GDP Securities.  The management company for Individual Holder Aurelius Opportunities Fund, LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

26.     Individual Holder 683 Capital Partners, LP is a Delaware limited partnership.  It is the beneficial owner of $341,331,000 notional amount of 2005 GDP Securities.  The management company for Individual Holder 683 Capital Partners, LP

was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

27.     Individual Holder Adona LLC is a Delaware limited liability company.  It is the beneficial owner of $120,000,000 notional amount of 2005 GDP Securities.

28.     Individual Holder Egoz I LLC is a Delaware limited liability company.  It is the beneficial owner of $95,101,000 notional amount of 2005 GDP Securities and $17,719,000 notional amount of 2010 GDP Securities.  The management company for Individual Holder Egoz I LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

29.     Individual Holder Egoz II LLC is a Delaware limited liability company.  It is the beneficial owner of $59,399,000 notional amount of 2005 GDP Securities and $9,281,000 notional amount of 2010 GDP Securities.  The management company for Individual Holder Egoz II LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

30.     Individual Holder Mastergen, LLC is a Delaware limited liability company.  It is the beneficial owner of $424,654,388 notional amount of 2005 GDP Securities and $131,100,000 notional amount of 2010 GDP Securities.

31.     Individual Holder Erythrina, LLC is a Delaware limited liability company.  It is the beneficial owner of $47,902,911 notional amount of 2005 GDP Securities.

32.     Individual Holder AP 2016 1, LLC is a Delaware limited liability company.  It is the beneficial owner of $93,547,937 notional amount of 2005 GDP

Securities. The management company for Individual Holder AP 2016 1, LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

33.    Individual Holder AP 2014 3A, LLC is a Delaware limited liability company. It is the beneficial owner of $10,324,000 notional amount of 2005 GDP Securities. The management company for Individual Holder AP 2014 3A, LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

34.    Individual Holder AP 2014 2, LLC is a Delaware limited liability company. It is the beneficial owner of $9,672,519 notional amount of 2005 GDP Securities. The management company for Individual Holder AP 2014 2, LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

35.    Individual Holder WASO Holding Corporation is an Exempted Company incorporated in the Cayman Islands. It is the beneficial owner of $841,976,210 notional amount of 2005 GDP Securities. The management company for Individual Holder WASO Holding Corporation was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

36.    Individual Holder Two Seas Global (Master) Fund LP is Cayman Islands Exempted Limited Partnership. It is the beneficial owner of $125,545,264 notional amount of 2005 GDP Securities and $5,000,000 notional amount of 2010 GDP Securities. The management company for Individual Holder Two Seas Global (Master)

Fund LP was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

37.     Individual Holder Virtual Emerald International Ltd. is a British Virgin Islands Exempted Limited Company.  It is the beneficial owner of $206,231,156 notional amount of 2005 GDP Securities.

38.     The GDP Securities were issued pursuant to the Global Securities held by depositaries of the securities clearinghouses DTC, Euroclear and Clearstream. The registered Holder for the 2005 GDP Securities—Cede & Co.—has, at all relevant times, been located in New York.

39.     There is no registry of the beneficial owners of the GDP Securities that any beneficial owner can access.  Participants in the clearinghouses hold interests in the Global Securities on behalf of their customers, who may themselves be beneficial owners of the GDP Securities or nominees for others who (directly or indirectly) beneficially own the GDP Securities.

40.     The GDP Securities beneficially owned by Individual Holders Aurelius Capital Master, Ltd.; ACP Master, Ltd.; Aurelius Opportunities Fund, LLC; 683 Capital Partners, LP; Adona LLC; Egoz I LLC; Egoz II LLC; Mastergen, LLC; Erythrina, LLC; AP 2016 1, LLC; AP 2014 3A, LLC; AP 2014 2, LLC; WASO Holding Corporation; and Two Seas Global (Master) Fund LP are held in New York-based accounts.

41.     The majority of purchases of GDP Securities by the Individual Holders were made through New York-based brokers.

15

42.      In each of the Global Securities, Argentina expressly acknowledged "with respect to the right of any Holder to pursue a remedy under . . . the [Global Securities], the right of any beneficial owner of the [Global Securities] to pursue such remedy with respect to the portion of [the] Global Security that represents such beneficial owner's interest in [the] Security as if Certificated Securities had been issued to such beneficial owner." (2005 Global Security (Exhibit B hereto) § 11; 2010 Global Security (Exhibit D hereto) § 9.)  Each Holder has the "absolute and unconditional" right to bring suit to enforce payment of any Payment Amount.  (*Id.*; Indenture (Exhibit A hereto) § 4.9.)  Accordingly, as beneficial owners, each Individual Holder has the right to bring suit for that portion of Payment Amounts due representing such Individual Holder's beneficial interest in the Global Securities.

43.      The Trustee is a New York banking corporation and serves as the Trustee for securities issued by the Republic pursuant to the Indenture, including the GDP Securities.  Under the terms of the Indenture and the Global Securities, it has the right to bring the claims as set forth herein on behalf of all Holders of the Global Securities.

44.      Defendant the Republic of Argentina is a foreign state as defined in 28 U.S.C. § 1603(a).

## JURISDICTION, VENUE, AND CHOICE OF LAW

45.      In the Governing Documents, Argentina explicitly and irrevocably waived sovereign immunity to the fullest extent permitted by the laws of the United States in any action with respect to the GDP Securities.  Thus, Argentina is not entitled to immunity under 28 U.S.C. §§ 1605-1607 or under any applicable

international agreement, and this Court therefore has jurisdiction pursuant to 28 U.S.C. § 1330.

46.     In the Governing Documents, Argentina irrevocably submitted to the jurisdiction of this Court over any action with respect to the GDP Securities, and appointed Banco de la Nación Argentina, at its office at 225 Park Avenue, New York, New York 10169, as its authorized agent for service of process.

47.     In the Governing Documents, Argentina waived any objection based on venue or otherwise to any action with respect to the GDP Securities being brought in this Court, and venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

48.     Argentina agreed that the Governing Documents shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

## FACTUAL ALLEGATIONS

**A.     Payment Conditions and Payment Amount for the GDP Securities**

49.     Under the terms of each Global Security, Argentina promised to pay the Payment Amount for any Reference Year if certain conditions are met: (i) Actual Real GDP exceeds Base Case GDP for the Reference Year (the **"Level Condition"**); (ii) Actual Real GDP Growth exceeds Base Case GDP Growth for the Reference Year (the **"Growth Condition"**); and (iii) as of the Calculation Date pertaining to the Reference Year, the aggregate of all payments made by Argentina under the Global Security, when added to the Payment Amount for such Reference Year, does not exceed the Payment Cap (the **"Payment Cap Condition"**).

50.    Payment Amount as defined in the Global Securities "means for any Payment Date, an amount equal to (i) the Available Excess GDP (converted into U.S. dollars) for the Reference Year corresponding to such Payment Date, multiplied by (ii) the notional amount of this Security outstanding as of such Payment Date. . . ." Available Excess GDP is a function of Excess GDP, which in turn is the difference between Actual Nominal GDP and Nominal Base Case GDP. Actual Nominal GDP and Nominal Base Case GDP are, respectively, Actual Real GDP and Base Case GDP multiplied by the GDP Deflator for the Reference Year in question.

51.    For each Reference Year, calculations to determine whether a payment is due are required to be made on the Calculation Date, defined in the Global Securities as "for any Reference Year, the 1st of November of the calendar year following such Reference Year"; and payment is required to be made on the Payment Date, defined in the Global Securities as "for any Reference Year, the 15th of December of the calendar year following such Reference Year." MECON, specifically the National Office of Public Credit (**"ONCP"**), is charged with performing the calculations required by the Global Securities to determine whether a Payment Amount is due, and the amount of any such payment.

**B.    The Global Securities Anticipate, and the Republic Tells Investors, That INDEC Would Publish the GDP Statistics Required for the GDP Securities**

52.    Determination of the payment conditions and calculation of the Payment Amount are based on Actual Real GDP, which the Global Securities anticipate will be published by INDEC. Actual Real GDP is defined in the Global Securities to mean "for any Reference Year the gross domestic product of Argentina for such

18

Reference Year measured in constant prices for the Year of Base Prices, as published by INDEC."

53.     In Argentine legal parlance, INDEC is a "deconcentrated" organ of the Argentine state.  It is a part of, and subject to hierarchical control by, MECON and, subject to direct oversight by the President.  INDEC does not have a legal identity separate from that of the Republic, and as such, INDEC's acts and omissions are the Republic's.

54.     The President of the Republic may issue instructions and orders to INDEC, require INDEC to produce statistics, and even overrule INDEC's decisions.  The President also has the power (which he/she has exercised) to appoint and remove INDEC's leadership, restructure INDEC, change INDEC's position within the government, reassign INDEC personnel, make temporary appointments, and limit the roles of temporary appointments and INDEC's leadership.

55.     The Republic represented to investors participating in the exchange offers that INDEC "is controlled by the Argentine government" and that INDEC would produce the GDP data required to make the calculations under the Securities.

56.     The Republic was obligated (i) to ensure that INDEC published the data necessary to make the calculations under the Securities and (ii) to perform those calculations.  Indeed, absent such obligations, the terms of the Securities would be nonsensical because there would be contractual formulas for payment conditions and Payment Amounts, but no assurance that the inputs for such formulas would ever be available or the calculations ever made.  Moreover, if Argentina has no obligation to

publish Actual Real GDP or perform the calculations, and the absence of that data and the calculations means Holders have no entitlement to payment, then the Securities would have been inherently valueless from the start, an absurd result.

**C.    The Global Securities Set Forth the Yearly Adjustment Fractions the Republic Must Apply to the Base Case GDP Figures in the Global Securities After a Rebasing**

57.    When INDEC publishes Actual Real GDP "measured in the constant prices for the Year of Base Prices" it is, in effect, applying the prices from that Year of Base Prices in order to control for changes in prices (both inflation and deflation) that otherwise occur over time.  In practice, this means that sectors of the economy are separately estimated, and the overall level of Actual Real GDP is a weighted average of the results for each sector, where the weights are a function of the prices in the chosen Year of Base Prices.  The prices, and thus the weights, are specific to the Year of Base Prices.

58.    The Global Securities recognized that when the Republic issued the GDP Securities, INDEC was measuring Actual Real GDP in constant 1993 prices, but that it might rebase.  Thus, the Year of Base Prices as defined in the Global Securities "means the year 1993; provided that if the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Year of Base Prices shall mean such other calendar year."

59.    Because INDEC was measuring Actual Real GDP in constant 1993 prices when the Republic issued the Securities, the initial Base Case GDP figures in the Global Securities were also provided in constant 1993 prices.  And just as the

Global Securities anticipated INDEC might change the Year of Base Prices used to measure Actual Real GDP, it required an adjustment to the initial Base Case GDP figures to account for the change.

60.     Adjustment of the initial Base Case GDP figures is necessary because changing the Year of Base Prices affects the calculation of Actual Real GDP and Actual Real GDP Growth.  Because the prices and associated weights are specific to each Year of Base Prices, Actual Real GDP and Actual Real GDP Growth for any given Reference Year will change when estimated using different base year prices and weights—*i.e.,* when measured in constant prices of a different Year of Base Prices. Rebasing may, for example, cause Actual Real GDP for a given Reference Year measured in a new Year of Base Prices to be a larger or smaller figure than the figure reported in the old Year of Base Prices (although usually larger since prices tend to rise over time), and may cause Actual Real GDP Growth also to be a larger or smaller figure.

61.     Further, the relationship between Actual Real GDP measured in the old and new Years of Base Prices varies year to year.  For example, Actual Real GDP for Reference Year 2007 measured in constant 1993 prices was 359,170 million pesos, and measured in constant 2004 prices was 621,943 million pesos;[4] the ratio of the figure in 2004 prices to 1993 prices was 1.73.  Actual Real GDP for Reference Year 2008 measured in constant 1993 prices was 383,444 million pesos, and measured in

_____

[4] In 2016, INDEC substantially revised previously reported figures for Actual Real GDP measured in constant 2004 prices.  Unless otherwise noted, the revised 2004 series is referred to herein.

21

constant 2004 prices was 647,176 million pesos; and the ratio between the two was 1.69. Likewise, Actual Real GDP Growth in any year will be different when measured in the old and new Years of Base Prices; and that difference in growth rates will itself vary year to year. For example, Actual Real GDP Growth for Reference Year 2007 was 8.65% when measured in constant 1993 prices and 9.01% when measured in constant 2004 prices; and Actual Real GDP Growth for Reference Year 2008 was 6.76% when measured in constant 1993 prices and 4.06% when measured in constant 2004 prices.

62.    The payment conditions and Payment Amount depend upon whether and the extent to which Actual Real GDP and Actual Real GDP Growth exceed Base Case GDP and Base Case GDP Growth, respectively. Because changing the Year of Base Prices affects the measurement of Actual Real GDP and Actual Real GDP Growth, changing the Year of Base Prices could significantly affect the calculation of the payment conditions unless there is an adjustment to the initial Base Case GDP figures that accounts for the change in the Year of Base Prices.

63.    The provisions in the Global Securities for adjusting Base Case GDP ensure that the rights of Holders to receive payments, and the obligations of Argentina to make payments, are substantially the same before and after a rebasing. In the absence of the adjustment, Actual Real GDP and Actual Real GDP Growth would be measured in constant prices of the new Year of Base Prices, while Base Case GDP and Base Case GDP Growth would be measured in constant 1993 prices. With the adjustment, the comparison between Actual Real GDP and Base Case GDP, and between Actual Real GDP Growth and Base Case GDP Growth, remains "apples to

apples" as it was when the GDP Securities were initially issued and the Year of Base

Prices was 1993.

64.    The adjustment provision is found in the definition of Base Case

GDP.  The definition of Base Case GDP contains a chart setting forth the initial Base

Case GDP values in constant 1993 prices.  The chart in the Global Security for the 2005

GDP Securities starts with Reference Year 2005.  The chart in the Global Security for

the 2010 GDP Securities starts with Reference Year 2009, and for that year and all the

subsequent years for the duration of the Securities, the Base Case GDP values are the

same for the 2005 and 2010 GDP Securities.

65.    In addition to the chart, the **"Adjustment Provision"** in the

definition of Base Case GDP dictates the adjustment that must be made to the figures in

the chart when INDEC rebases:

> if the Year of Base Prices employed by INDEC for
> determining Actual Real GDP shall at any time be a
> calendar year other than the year 1993, then the Base
> Case GDP *for each Reference Year* shall be adjusted to
> reflect any such change in the Year of Base Prices by
> ***multiplying the Base Case GDP for such Reference Year***
> (as set forth in chart [contained in the Global Securities])
> ***by a fraction***, the numerator of which shall be the Actual
> Real GDP for such Reference Year measured in constant
> prices of the Year of Base Prices, and ***the denominator of***
> ***which shall be the Actual Real GDP for such Reference***
> ***Year measured in constant 1993 prices***.

(Emphasis added.)  Thus, if a change in the Year of Base Prices occurs, then by its

terms, the Adjustment Provision requires the calculation and use of an adjustment

fraction (for each Calculation Date thereafter) comprised of a numerator—"Actual Real

GDP for such Reference Year measured in constant prices of the Year of Base Prices"

[*i.e.,* the new Year of Base Prices after rebasing]—and a denominator—"Actual Real

GDP for such Reference Year measured in constant 1993 prices." For each Reference Year, this fraction is the **"Adjustment Fraction"** for that year. If, for example, the change in the Year of Base Prices caused Actual Real GDP for a given Reference Year to be 50% higher than it would have been using 1993 prices, the Adjustment Fraction for that year would be 1.5, and Base Case GDP for that Reference Year would be adjusted upward by 50%.

66.    The Adjustment Fraction must be calculated separately for "each Reference Year" based upon GDP data for "such Reference Year." A separate Adjustment Fraction for each Reference Year reflects the fact that the relationship between Actual Real GDP as measured in the old and new Years of Base Prices is not constant from year to year, and the relationship between Actual Real GDP Growth as measured in the old and new Years of Base Prices is not constant from year to year.

67.    Base Case GDP Growth for a given Reference Year, the threshold for the Growth Condition that year, is defined as the percentage increase in Base Case GDP for that year over Base Case GDP for the prior year. Accordingly, if Base Case GDP is adjusted pursuant to the Adjustment Provision, Base Case GDP Growth will be calculated using Base Case GDP as so adjusted.

68.    The Adjustment Provision provides important protection for investors in the GDP Securities. At the time the Securities were issued in 2005, investors had more than five years of experience with the 1993 series; by the 2010 issuance, more than ten years. By contrast, investors could not know when the Republic would rebase, what changes in methodology the Republic would institute as

part of a rebasing, and how those changes would affect Actual Real GDP and Actual Real GDP Growth.

69.     The Adjustment Provision also prevented the Republic from using a rebasing to avoid or affect a payment that would otherwise be due—for example, by rebasing at a time when it saw a payment would be due based on statistics in 1993 prices but not in the new Year of Base Prices, or by making methodological choices in connection with the adoption of a new Year of Base Prices that might avoid a payment.  If the Level Condition and Growth Condition would have been satisfied using 1993 series data before a rebasing, the Adjustment Provision ensures that those conditions would still be satisfied after a rebasing.

70.     Just as the Global Securities require that Argentina (through INDEC) publish Actual Real GDP measured in constant prices of the new Year of Base Prices for each Reference Year, it also requires that after a rebasing Argentina (through INDEC) continue to publish Actual Real GDP measured in constant 1993 prices for each Reference Year because that figure is the denominator input for the yearly Adjustment Fractions and, thus, required for each Reference Year's calculations mandated by the Global Securities.  Again, INDEC is a part of MECON and subject to direct oversight by the President, who may issue instructions and orders to INDEC and overrule INDEC's decisions.  INDEC had the ability, and the Republic has the power to compel INDEC, to publish Actual Real GDP measured in constant 1993 prices, and the Republic is obligated to ensure that INDEC does so, so that after a rebasing such data would be available to calculate the contractually-required Adjustment Fraction for each Reference Year.

4859-4921-1370.1

71.    Requiring Argentina to continue publishing Actual Real GDP measured in constant 1993 prices after a rebasing is consistent with academic literature concerning securities that are linked to GDP statistics, such as the Securities.  For example, a 2004 paper published by the U.S. Council of Economic Advisors entitled, "Growth-Indexed Bonds: A Primer" noted that "investors may worry that the revisions or any methodological changes in compiling the statistics could complicate payments on growth-indexed debt[.]"  It proposed as a possible solution: "Changes to statistical methodologies could be handled by requiring governments to keep separate GDP series calculated with the old methodology, even after adopting a new technique for other purposes, until the outstanding contracts reach maturity."

72.    Likewise a 2006 paper by Stephany Griffith-Jones and Krishnan Sharma, titled, "GDP-Indexed Bonds: Making It Happen," proposed that, "[if] there was a major change in methodology of data calculation, Governments could be required to keep separate GDP series calculated with the old methodology until the bonds mature."

73.    And a 2016 paper published by the Bank of England, entitled "Sovereign GDP-linked bonds," noted that GDP estimates "are prone to revision, rebasing, and in extreme cases manipulation," and suggested as a possible solution "requiring governments or outside agencies to keep separate GDP series based on the old method (so that payments are based on a 'notional' series rather than the one following the latest methodology)."

**D.    The Republic Embarks on a Course of Conduct to
Avoid Its Payment Obligations Under the GDP Securities**

***1.    The Republic Knew It Would Owe a Payment for 2013 Under the Plain
Language of the Global Securities that Would Further Deplete Its
Already Diminished Foreign Currency Reserves***

74.    On September 27, 2013, the Director of the ONCP (the office immediately responsible for making the calculations under the GDP Securities) sent an email to more than two dozen colleagues at MECON, including the Minister of Economy and the Secretary of Finance, warning that in light of data published by INDEC as of that date there would need to be a steep recession in the balance of 2013 to avoid satisfying the Growth Condition and triggering a payment on the GDP Securities for Reference Year 2013.

75.    Statistics published by INDEC after September 27, 2013 confirmed that Argentina did not go into recession in 2013.  Although Argentina never published full year 2013 Actual Real GDP measured in constant 1993 prices, had it done so, those figures would have shown that 2013 Actual Real GDP Growth measured in constant 1993 prices was approximately 4.9%, well above unadjusted 2013 Base Case GDP Growth of 3.22%, thereby satisfying the Growth Condition and (because the other payment conditions were also met) triggering a Payment Amount due on the Securities for Reference Year 2013.

76.    MECON analyses from early 2014 noted that Argentina faced a payment of nearly $3 billion on the GDP Securities and other series of virtually identical GDP-linked securities (such as those at issue in the English Litigation) for Reference Year 2013.  These analyses also showed that a very large payment on account of Reference Year 2013 would be due even after the contemplated rebasing if

INDEC published full year 2013 Actual Real GDP measured in constant 1993 prices and the Republic properly applied the Adjustment Fraction.

77.     That potential payment, according to a MECON analysis, would cause a "heavy loss" in foreign currency reserves.  At that time, Argentina's foreign currency reserves were already under intense pressure, having declined from over $50 billion in 2011 to less than $30 billion by January 2014.

78.     Argentine officials at MECON and the BCRA, Argentina's central bank, closely monitored the country's foreign currency reserves.  As the President of Argentina acknowledged in a 2013 report:  "The accumulation of reserves is the main strategy to sustain the [Argentine] peso according to the productive needs of the country.  In this way, we generate a true anti-crisis insurance that allows us to reduce external vulnerability, provide certainty to public and private investment, and develop a capital market."

79.     In February 2014, DBRS, a credit rating agency, downgraded the Republic's credit rating, noting the need to "stem reserve losses" or Argentina would face further downgrades.

**2.      The Republic Uses the Rebasing as a Pretext to Stop Publishing the Denominator of the Adjustment Provision—Actual Real GDP Measured in Constant 1993 Prices**

80.     On March 27, 2014—at around the same time when INDEC would have been expected to publish full year 2013 Actual Real GDP measured in constant 1993 prices, which, when used as the denominator of the Adjustment Provision for 2013, would have confirmed that a payment was due—Minister of Economy Axel Kicillof announced that (1) the Republic was changing the Year of Base Prices from

1993 to 2004; and (2) INDEC would only publish Actual Real GDP measured in constant 2004 prices going forward, and would cease publishing Actual Real GDP measured in constant 1993 prices.

81.    That same day, INDEC reported 2013 Actual Real GDP and 2013 Actual Real GDP Growth measured in constant 2004 prices.  2013 Actual Real GDP Growth measured in constant 2004 prices was 3%.[5]  Argentina also should have published full year 2013 Actual Real GDP measured in constant 1993 prices for the denominator of the Adjustment Fraction, but it never did and, consequently, never performed the calculations required by the Global Securities.  Using the figure Plaintiffs contend (and the English Court determined) for 2013 Actual Real GDP measured in constant 1993 prices, 2013 Base Case GDP Growth was below 2%, meaning that the Growth Condition had still been met and a Payment Amount was still due for 2013, notwithstanding the rebasing.

82.    INDEC could have continued to publish Actual Real GDP measured in constant 1993 prices after the rebasing.  The cost, time and burden of doing so would have been relatively modest, and INDEC could have used much of the same data gathered to publish Actual Real GDP measured in constant 2004 prices.  Had the President directed INDEC to continue publication, it would have done so.

### 3.    The Republic Jettisons the Yearly Adjustment Fractions in the Global Securities

---

[5] As noted, *see* footnote 4, *supra*, INDEC substantially revised Actual Real GDP measured in constant 2004 prices in 2016.  The 3% Actual Real GDP Growth figure for 2013 refers to the growth figure for the 2004 series as published by INDEC in 2014, not the later-revised GDP figures.

83.     Days after Kicillof's announcement, Guillermo Nielsen, the former Secretary of Finance who had overseen the initial issuance of the GDP Securities in 2005, co-authored a newspaper article, entitled, "To Pay or Not To Pay, the Coupon Dilemma."  The article explained that even though Base Case GDP would need to be adjusted under the plain language of the Adjustment Provision in light of the rebasing, that would not change whether a payment was due for Reference Year 2013. Nielsen and his co-author stated that "if growth for the year 2013, calculated with figures from 1993 as a basis, was 4.9%, and the new GDP figures from the years 2012 and 2013 growth was 3%, the 'basis case' with the new way of calculating would be approximately 1.38%, significantly lower than 3%."  Thus, the article opined, "even with the change of basis to 2004, given the issuing standards, a growth of 3% with the new GDP would result in the coupon needing to be paid" for Reference Year 2013.

84.     Numerous high-ranking Argentine officials, including the Chief of Cabinet and the Minister of MECON were aware of and discussed Nielsen's article. ONCP staff prepared a memorandum for the Secretary of Finance, noting that under the Adjustment Provision as explained by Nielsen, the Republic would need to publish full year 2013 Actual Real GDP measured in constant 1993 prices, and that if it did so, the Growth Condition would be met and a payment triggered for Reference Year 2013.

85.     On or about April 3, 2014, Jorge Capitanich, the Republic's Chief of Cabinet testified before the Argentine National Congress that Nielsen's explanation of the plain language of the Adjustment Provision was "not compatible with the one made by the National State" and that no payment would be made for Reference Year 2013 (even though the Calculation Date was months away).  He did not explain

30

how the Republic had reached that conclusion or why it disagreed with Nielsen, and it would be almost a decade before the Republic would disclose what it had done and only after the commencement of litigation.

86.     What the Republic had done was jettison the Adjustment Fractions that the Global Securities required it to first calculate for each Reference Year and then use in the other calculations the Global Securities required it to perform. Instead of following the plain words and calculating an Adjustment Fraction for each Reference Year, the Republic decided that it would calculate an adjustment fraction for just one Reference Year—what it calls the "overlap year"—which the Republic contends it can select in its sole discretion. The numerator of the Republic's fraction would be Actual Real GDP measured in the new Year of Base Prices for the "overlap year," and the denominator would be Actual Real GDP measured in constant 1993 prices for the "overlap year." That single adjustment fraction would be applied to all Reference Years—in effect, a constant adjustment fraction.

87.     A constant adjustment fraction assumes that the impact of a rebasing is consistent from year to year, and that the relationship between the old and new GDP series is constant over time. That is not the case, which is why the Adjustment Fraction as written is required to be calculated anew for each Reference Year.

88.     With a constant adjustment fraction, every year's Base Case GDP Growth is the same after a rebasing as before it, even though the rebasing itself is bound to affect (as it did here, materially) Actual Real GDP Growth. Indeed, the Republic's approach would leave Base Case GDP Growth for each year unaltered regardless

31

whether, when, or how many times the Republic chose to rebase GDP, and regardless what methodological and weighting changes it adopted with each rebasing. In effect, the Republic contends that to determine whether the Growth Condition has been met, one compares Actual Real GDP Growth measured in constant prices of the new Year of Base Prices, with Base Case GDP Growth measured in constant 1993 prices. Making that apples-to-oranges comparison, the Republic has asserted that the Growth Condition was not satisfied, and thus no payments are due, for Reference Years 2013 through 2020.

89.     In adopting a constant adjustment fraction, the Republic purported to rely upon the supposed "logic" and "spirit" of the contract, not the plain words. Indeed, when the Republic first disclosed that it was using a constant adjustment fraction, in January 2022 as part of an amended pleading in the English Litigation, it admitted that conforming the actual words of the Global Security to a constant adjustment fraction would require adding 32 words to the Adjustment Provision.

90.     Upon information and belief, the Republic did not actually calculate or apply a constant adjustment fraction until it was performing the calculations for Reference Year 2021. Prior to that time, it had simply compared Actual Real GDP Growth measured in constant 2004 prices to unadjusted Base Case GDP Growth measured in 1993 prices to determine that the Growth Condition had not been met and, therefore, failed to perform the contractually-required calculations.

91.     For Reference Year 2021, where the Growth Condition was met even under the Republic's extra-contractual approach (because 2021 Actual Real GDP

Growth measured in constant 2004 prices exceeded unadjusted 2021 Base Case GDP

Growth measured in constant 1993 prices), the Republic announced for the first time in

December 2022 that it had used 2012 as the "overlap year" to determine the constant

fraction. The Republic did not announce what constant fraction it was actually using,

but it purported to determine that the Level Condition had not been met.

92.    The Republic has not disclosed any of the calculations it has

made with respect to Reference Year 2013 or thereafter.

93.    The English Court soundly rejected the Republic's constant

fraction for a host of reasons, including:

(a)    It is atextual, and requires the addition of 32 words to the Adjustment Provision.

(b)    The Adjustment Provision as written ensures for investors that a rebasing will not affect whether payments are due; a constant fraction does not.

(c)    The yearly Adjustment Fractions ensure the effect of a rebasing is properly reflected on both sides of the Level and Growth Conditions (*i.e.*, Actual Real GDP to Base Case GDP, and Actual Real GDP Growth to Base Case GDP Growth). Otherwise, the rebasing would be reflected on the Actual Real GDP side, but not properly on the Base Case GDP side because the adjustment would not reflect the actual effect on Base Case GDP for any year other than the single overlap year used to determine the constant fraction.

(d)    The Republic has discretion under its extra-contractual constant adjustment fraction to choose the "overlap year" for determining the constant fraction. That decision is significant because the choice of the "overlap year" determines the value of the constant fraction, which, in turn, affects the thresholds for the Level Condition and, consequently, the Payment Amount (if any) for every year. The Global Securities do not mention the concept of a constant fraction at all, let alone suggest any criteria for determining what single overlap year should be used to determine a constant fraction. Nothing in the Global Securities suggested that Holders wanted to give the Republic complete discretion to

alter the Level Condition or the Payment Amount by selecting the overlap year for a constant fraction.

(e)     The yearly Adjustment Fractions protect investors from the moral hazard that the Republic will make various choices most favorable to it.

### 4.     The Republic Discourages INDEC from Publishing Actual Real GDP Measured in Constant 1993 Prices

94.     Not only did the Republic fail to ensure that INDEC continued to publish Actual Real GDP measured in constant 1993 prices, it discouraged INDEC from doing so.  In April 2014, MECON senior officials organized and had knowledge of an unprecedented meeting with INDEC, the effect of which was to ensure that INDEC did not publish Actual Real GDP measured in constant 1993 prices.

95.     Even though Kicillof had announced that INDEC would no longer publish Actual Real GDP measured in constant 1993 prices, Nielsen had made clear the figure was necessary for the GDP Security calculations.  Capitanich's congressional testimony rejected the plain language of the contract without explanation, and without addressing whether INDEC would publish 2013 Actual Real GDP measured in constant 1993 prices as Nielsen had anticipated INDEC would do.  A multi-billion-dollar payment on the Securities hung in the balance.

96.     The MECON official responsible for making the calculations required by the Global Securities, Santiago Wright, met with the INDEC official responsible for calculating Actual Real GDP, Gustavo Rodriguez.  Wright conferred with senior MECON officials in advance.  Wright and Rodriguez had never met before.

97.     Wright told Rodriguez what Capitanich had not told Congress or the public (and what the Republic would not disclose for almost a decade), i.e., the Republic was going to jettison the yearly Adjustment Fractions in the Global Securities

and instead use a constant adjustment fraction that did not require the continued publication of Actual Real GDP measured in constant 1993 prices.

98.    Wright asked Rodriguez whether INDEC was going to publish full year 2013 Actual Real GDP measured in constant 1993 prices.  Rodriguez assured Wright that INDEC would not.  Wright immediately reported that information back to his superiors at MECON.

99.    Notably, before the meeting, INDEC personnel had performed their own analysis, which included a figure for full year 2013 Actual Real GDP measured in constant 1993 prices, confirming that after a rebasing and application of the Adjustment Provision, the Growth Condition would be met for Reference Year 2013. But, after the meeting, INDEC personnel revised the analysis to reflect the constant adjustment fraction the Republic planned to use instead of the Adjustment Fraction in the Global Securities, and which did not require publication of full year 2013 Actual Real GDP measured in constant 1993 prices.  The revised INDEC analysis showed that no payment would be due for 2013 regardless of the overlap year and constant fraction selected.

> **5.    *For Reference Years After 2013, If the Republic Had Published Actual Real GDP Measured in Constant 1993 Prices and Applied the Yearly Adjustment Fractions, It Would Have Been Clear That Payment Amounts Were Due***

100.    For Reference Years after 2013, INDEC did not publish Actual Real GDP measured in constant 1993 prices.  The Republic also failed to apply the Adjustment Provision set forth in the Global Securities and, therefore, failed to perform the calculations required by the Global Securities.

4859-4921-1370.1

101.    The Republic did not make a payment under the GDP Securities for any Reference Year after 2013.  For each Reference Year from 2014 through 2020, the Republic announced that no payment was due because Actual Real GDP Growth for the year in question did not exceed Base Case GDP Growth—in other words, because the Growth Condition was not satisfied.  For Reference Years 2021 and 2022, the Republic announced that the Growth Condition had been met, but the Level Condition (whether Actual Real GDP exceeded Base Case GDP) had not been satisfied.

102.    However, the Republic did not calculate Base Case GDP and Base Case GDP Growth (which are needed to determine, respectively, satisfaction of the Level and Growth Conditions) for those Reference Years as required by the Global Securities because the Republic failed to publish Actual Real GDP measured in constant 1993 prices for those Reference Years, which is a necessary input for calculating the yearly Adjustment Fractions required by the Global Securities.

103.    Instead of publishing Actual Real GDP measured in constant 1993 prices, applying the yearly Adjustment Fractions and calculating Base Case GDP and Base Case GDP Growth for Reference Years 2014 through 2022 in accord with the Global Securities, the Republic applied its extra-contractual constant adjustment fraction.

104.    If the Republic had published Actual Real GDP measured in constant 1993 prices for Reference Years 2014-2022 and applied the yearly Adjustment Fractions to calculate Base Case GDP and Base Case GDP Growth as required by the Global Securities, it would have been apparent for several of those years that the payment conditions were satisfied, and that the Republic owed Payment Amounts.

105.    While discovery will presumably provide additional relevant information, the publicly available data published by the Republic demonstrates that the Republic owed Payment Amounts for some, if not all, Reference Years after 2013.

106.    For the period from 2004 to 2013 (the **"Overlap Period"**), there are two series of Actual Real GDP data—one measured in constant 1993 prices and the other in constant 2004 prices.[6] By comparing these two series of GDP data over the Overlap Period, several noteworthy observations can be made.

107.    During the Overlap Period, the 1993 series reported higher growth in Actual Real GDP than the 2004 series. The cumulative growth rate in Actual Real GDP from 2004 to 2013 was 27.5 percentage points higher in the 1993 series than the 2004 series. The average difference between (i) the percentage growth in Actual Real GDP measured in constant 1993 prices, and (ii) the percentage growth in Actual Real GDP measured in constant 2004 prices for the years in the Overlap Period was 1.9%. For seven of the nine Reference Years in the Overlap Period where an annual growth rate can be calculated (including the most recent three), Actual Real GDP Growth was higher in the 1993 series than the 2004 series. In each of Reference Years 2011 and 2012, Actual Real GDP Growth was 2.9 percentage points greater in the 1993 series than in the 2004 series and for Reference Year 2013, the 1993 series

---

[6] All of this data was published by INDEC or based upon statistics published by INDEC contemporaneously with the periods in question. For 2013, the figure is that determined by the English Court in the English Litigation, taking into account Actual Real GDP published by INDEC for the first three quarters and EMAE data (an index of economic activity also published by INDEC) for the fourth quarter.

outperformed the 2004 series by 2.5 percentage points; thus, the differential over the last three Reference Years of the Overlap Period averaged 2.8 percentage points.

108.    Unadjusted Base Case GDP Growth for the years after 2013 was 3%. The effect of the yearly Adjustment Fractions is that if Actual Real GDP Growth measured in constant 1993 prices exceeded 3% in any of those years, the Growth Condition would have been satisfied for that year. This condition was obviously satisfied for at least four years at issue in this case. Actual Real GDP Growth measured in constant 2004 prices for Reference Years 2015, 2017, 2021, and 2022 was 2.459%, 2.854%, 10.398%, and 4.956%, respectively. Given that, as quantified above, Actual Real GDP Growth was much higher under the 1993 series than the 2004 series during the Overlap Period, Actual Real GDP Growth measured in constant 1993 prices for 2015, 2017, 2021, and 2022 would have been far above 3% if the 1993 series data had been published and the Republic had performed the contractually-required calculations.

109.    Likewise, the effect of the yearly Adjustment Fractions is that if Actual Real GDP measured in constant 1993 prices exceeded unadjusted Base Case GDP, then the Level Condition would have been satisfied. Even if, following the Overlap Period, Actual Real GDP Growth under the 1993 series were the same as under the 2004 series, Actual Real GDP measured in constant 1993 prices would have exceeded unadjusted Base Case GDP for Reference Years 2015, 2017, 2018, and 2022 and fallen just short of that in 2021. But Actual Real GDP Growth was almost surely much higher under the 1993 series than the 2004 series following the Overlap Period, as it was during the Overlap Period; so Plaintiffs believe the Level Condition was met in all five of those Reference Years, among others at issue in this case.

110.    The Republic has admitted that INDEC no longer has the capability to estimate Actual Real GDP and Actual Real GDP Growth measured in constant 1993 prices, and that such analysis is for academics and consultants.  To that effect, using data published by the Republic for the 1993 and 2004 series and employing established and accepted statistical techniques, including regression analyses, there is a strong basis upon which to estimate what Actual Real GDP and Actual Real GDP Growth measured in constant 1993 prices would have been for Reference Years after 2013.

111.    Applying these established and accepted statistical techniques, Actual Real GDP and Actual Real GDP Growth measured in constant 1993 prices were such that the Growth and Level Conditions were satisfied for several Reference Years after 2013, including 2015, 2017, 2018, 2021, and 2022.

112.    Applying those techniques, the Payment Amounts due for each of Reference Years 2015, 2017, 2018, 2021 and 2022 range from approximately $1.0 to $1.6 billion, and the total amount due is roughly $5-6 billion, not including pre- and post-judgment interest.  Additional Payment Amounts may be due for Reference Years after 2022.

113.    As of the Calculation Date for each of Reference Years 2015, 2017, 2018, 2021, and 2022, the aggregate of payments theretofore made by Argentina under the Global Securities (approximately $2.9 billion) when added to the Payment Amount due for such Reference Year did not exceed the Payment Cap (approximately $8.1 billion), and thus the Payment Cap condition was also satisfied for each of those Reference Years.

**6.**     ***The Republic's Untimely Production of Manufactured Information Does Not Relieve the Republic of its Payment Obligations and Further Breached the Global Security***

114.    In the English Litigation, the English Court found that the Republic had breached its obligation to holders of the Euro-denominated GDP Securities to continue publishing GDP figures measured in constant 1993 prices. Accordingly, by Order dated June 9, 2023, the English Court ordered the Republic to publish those figures for 2014 through 2022 together with related information prescribed by the English Court.

115.    Specifically, the English Court Order required that for each Reference Year from 2014 through 2022 the Republic must:

> publish or cause to be published GDP in 1993 Year of Base Prices for such Reference Year, using a methodology as close as possible to that used by INDEC for Reference Years 2006 to 2012, together with a description of the methodology applied, in a level of detail approximating the detail made available by INDEC for quarterly GDP publications prior to 2014.

The English Court also ordered the Republic to make payments for those Reference Years where the payment conditions had been met on the basis of such data.

116.    In July 2024, the Republic released what it claimed to be the information required by the English Court's June 9, 2023 Order (the **"Manufactured Information"**). On the basis of the Manufactured Information, the Republic now claims that no payments are due for Reference Years 2014 through 2022 even applying the Adjustment Provision as interpreted by the English Court (and by Plaintiffs here and the plaintiffs in the 2013 US Litigation) rather than the Republic's constant adjustment fraction alternative. As described below, the Manufactured Information is manifestly false, does not comply with the English Court's Order, does not provide a basis to

40

relieve the Republic of its payment obligations, and evidences a further breach of the Global Securities.

> (a)   **The Manufactured Information Is Manifestly False Because It Contradicts Actual Real GDP Measured in Constant 1993 Prices Previously Published by INDEC**

117.    The Manufactured Information purports to disclose Actual Real GDP measured in constant 1993 prices for 2013 through 2022.  However, the starting point for all of the Manufactured Information—the figure for 2013—is manifestly false. The English Court has determined the correct figure to be 491.3 billion Argentine pesos, based on Actual Real GDP for the first three quarters of 2013 and closely related economic data, all measured in constant 1993 prices, that INDEC published in the ordinary course in 2013 and 2014.  According to the Manufactured Information, however, the 2013 figure is 429.2 billion pesos, 12.6% less than what it actually was.

118.    The falsity of the Republic's just-released 429.2 billion peso figure for 2013 is further evident when considered in the context of data published by INDEC in the ordinary course more than a decade ago for the period 2010-2012.  The table below shows those figures and the figure for 2013 as determined by the English Court.

|  | Actual Real GDP (B peso) | Annual Growth | 2010-2013 Cumulative Growth |
|---|---|---|---|
| 2010 | 422.13 | | |
| 2011 | 459.57 | 8.9% | |
| 2012 | 468.30 | 1.9% | |
| 2013 | 491.31 | 4.9% | 16.4% |

The Republic's manufactured 429.2 billion peso figure for 2013 is not only below the actual 2013 figure, it is below the actual figures for 2012 and 2011, and just 1.0% above

the figure for 2010. Thus, according to the Manufactured Information, virtually all of the 16.4% growth that INDEC previously reported never happened.

119.    Alternatively, given the INDEC-reported figures for Actual Real GDP measured in constant 1993 prices for the first three quarters of 2013 (415.3, 519.6, and 494.0 billion pesos, respectively), for the full-year to be 429.2 billion pesos, as the Republic now contends, Actual Real GDP for the fourth quarter must have been 287.8 billion pesos—representing an extraordinary year-over-year contraction of fourth quarter Actual Real GDP of approximately 40%—on a par with, or worse than, the contraction experienced during the COVID pandemic or the Great Depression.

120.    Either way, this is the preposterous starting point for the figures for 2014-2022 provided by the Manufactured Information, on the basis of which the Republic argues that it owes no money for those years.[7]

121.    With the Manufactured Information, the Republic has wholesale abandoned all of the figures for Actual Real GDP measured in constant 1993 prices previously published by INDEC. For the Republic to do so now is breathtaking given its repeated assurances as to their accuracy. The Republic told the IMF they were accurate, issued press releases attesting to their accuracy, and began criminal proceedings against those who disagreed. In the 2013 US Litigation, the Republic admitted that INDEC's previously published figures had been correctly determined in accordance with the only methodology INDEC had ever used to estimate Actual Real

---

[7] The claims for payment asserted herein extend to Reference Years after 2022.

GDP measured in constant 1993 prices, and that INDEC had never even considered using another methodology.

> **(b)** **The Manufactured Information Uses the Methodology for Actual Real GDP Measured in Constant 2004 Prices, Rather than Constant 1993 Prices**

122.    According to the English Order, the Republic was supposed to use a methodology "as close as possible" to that used by INDEC to estimate Actual Real GDP measured in constant 1993 prices for the period 2006-2012.  Argentina did not even come close, and instead used the methodology for estimating Actual Real GDP measured in constant 2004 prices.  The "Methodological Note" accompanying the Manufactured Information makes plain that it is not based on the 1993 methodology, but instead uses the 2004 methodology.  Substituting the 2004 methodology for the 1993 methodology had a dramatic downward impact on the Manufactured Information.

123.    Rebasing GDP will often materially change the measured rate of growth in real GDP.  That is exactly what happened here, as is easily observed for the Overlap Period.  For that period, Argentina's real GDP growth rate is publicly known for both the 1993 and 2004 series.  As shown below, for the Overlap Period as a whole, and for most calendar years within the Overlap Period, Argentina's real GDP grew materially more in the 1993 series than the 2004 series.

124.    With respect to a given period, we use the term "**Growth Rate Differential**" to mean the percentage growth in the 1993 series (or, where indicated, a sectoral component thereof) in that period minus the percentage growth in the 2004 series (or sectoral component) for the same period.  For example, if the 1993 series grew 4.0% in one year and the 2004 series grew 3.0% in that year, the Growth Rate

Differential for that year would be a positive 1.0% (meaning the growth under the 1993 series was one percentage point faster than under the 2004 series); and if the 1993 series grew 3.0% in one year and the 2004 series grew 4.0% in that year, the Growth Rate Differential for that year would be a negative 1.0% (growth one percentage point slower under the 1993 series than under the 2004 series).

125.    Table 1 below shows the Growth Rate Differential for each year during the Overlap Period, presented for total Actual Real GDP and for each sectoral component of Actual Real GDP.[8]  In seven of the nine years, the Growth Rate Differential was positive—meaning that the 1993 series grew faster than the 2004 series.  In each of the two years where the Growth Rate Differential was negative, it was only modestly so (1.0% or less); whereas when the Growth Rate Differential was positive, it was often quite materially so.  The Growth Rate Differential was positive in five of the six most recent years in the Overlap Period; and in each of those five years the Growth Rate Differential was between 2.7% and 6.8%—meaning that GDP growth for each of those years was 2.7 percentage points to 6.8 percentage points greater under the 1993 series than the 2004 series.

---

[8] 2004 is not included in Tables 1-4 because INDEC did not publish an Actual Real GDP figure measured in constant 2004 prices for 2003, making it impossible to calculate 2004 Actual Real GDP Growth measured in constant 2004 prices.

**TABLE 1**

**Annual Growth Rate Differentials:**
**Actual Real GDP Growth in Constant 1993 Prices**
**Minus Actual Real GDP Growth in Constant 2004 Prices**

| Sector[9] | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013[10] |
|---|---|---|---|---|---|---|---|---|---|
| **Total GDP** | **0.3%** | **0.4%** | **-0.4%** | **2.7%** | **6.8%** | **-1.0%** | **2.9%** | **2.9%** | **2.5%** |
| Agriculture | -8.1% | 3.8% | 0.9% | -0.2% | 10.6% | -12.7% | 0.2% | 2.0% | 1.9% |
| Fishing | -6.6% | 3.5% | 3.8% | -1.2% | 8.0% | 8.0% | 3.0% | -2.3% | -0.6% |
| Mining | 0.1% | -2.4% | 2.0% | 2.2% | -1.3% | -3.1% | 2.3% | 2.2% | 3.9% |
| Manufacturing | 0.0% | -0.2% | 0.1% | 0.9% | 6.7% | -1.1% | 3.3% | 2.5% | 1.4% |
| Utilities | -1.1% | -0.9% | 3.2% | -1.5% | 1.5% | 4.4% | -0.2% | 0.2% | 3.4% |
| Construction | 7.9% | 5.5% | -0.9% | -0.5% | 8.5% | -4.6% | -0.5% | -0.2% | 0.9% |
| Commerce | -0.6% | -2.4% | -0.5% | 2.6% | 7.8% | 0.4% | 4.0% | 4.7% | 5.4% |
| Hotels | -4.2% | -4.6% | -2.4% | 7.2% | 3.4% | -2.1% | 2.6% | 0.2% | 2.4% |
| Transport | -0.1% | 0.9% | 1.0% | 6.7% | 7.1% | 1.7% | 3.9% | 4.4% | 4.4% |
| Finance | 7.7% | 9.0% | 4.6% | 11.1% | 0.9% | 8.2% | 11.4% | 12.2% | 18.4% |
| Real Estate | -1.2% | -2.5% | -0.9% | 0.8% | 6.8% | -1.1% | 0.6% | 1.0% | 1.4% |
| Public Adm. | -2.0% | 1.1% | -1.9% | -0.3% | 1.8% | 1.5% | 0.8% | 1.1% | 0.0% |
| Education & Health | -3.6% | 1.0% | -1.2% | -0.7% | -0.9% | 0.6% | 0.6% | -0.2% | 0.1% |
| Personal Services | -0.4% | -2.0% | -0.6% | 1.4% | 3.2% | -1.6% | 0.2% | -1.0% | 1.9% |
| VAT | 5.8% | -3.4% | -6.6% | 5.9% | 8.7% | 1.2% | 3.0% | 1.8% | -4.7% |
| Import Taxes | 3.3% | 0.3% | 0.0% | -0.9% | 2.8% | -1.4% | -2.4% | 2.7% | 10.2% |

126.    Table 2 makes a similar comparison, but instead of showing the

Growth Rate Differentials one year at a time, it shows cumulative Growth Rate

Differentials during the Overlap Period through the year indicated.  For example, the

figures in the column for "2010" are Growth Rate Differentials for the portion of the

Overlap Period up to and including 2010.  Of particular note, for the entire Overlap

Period (column "2013"), the Growth Rate Differential was 27.5%.

---

[9] For purposes of Tables 1-4, the sectoral figures for the 2004 series were correlated to
match the reporting protocols used for the 1993 series.  Such correlation had no impact
on the Total GDP figures.

[10] In this column, sectoral data is for the first nine months of 2013 (full-year sectoral
data is not publicly available), and the figure shown for Total GDP is for the full year
2013 (as determined by the English Court and asserted by the Plaintiffs here).

**TABLE 2**

**Cumulative Growth Rate Differentials:**
**Actual Real GDP Growth in Constant 1993 Prices**
**Minus Actual Real GDP Growth in Constant 2004 Prices**

| Sector | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013[11] |
|---|---|---|---|---|---|---|---|---|---|
| **Total GDP** | **0.3%** | **0.8%** | **0.5%** | **4.0%** | **13.0%** | **13.0%** | **18.1%** | **22.8%** | **27.5%** |
| Agriculture | -8.1% | -3.7% | -3.0% | -3.2% | 10.5% | 1.8% | 2.1% | 4.4% | 8.8% |
| Fishing | -6.6% | -7.6% | -1.5% | -3.1% | 8.5% | 18.4% | 23.3% | 20.1% | 23.8% |
| Mining | 0.1% | -2.3% | -0.2% | 2.0% | 0.7% | -2.5% | 0.0% | 2.1% | 3.1% |
| Manufacturing | 0.0% | -0.2% | -0.1% | 1.1% | 9.8% | 9.5% | 15.0% | 18.5% | 21.4% |
| Utilities | -1.1% | -2.1% | 1.4% | -0.3% | 1.5% | 6.9% | 7.0% | 7.5% | 11.0% |
| Construction | 7.9% | 15.5% | 16.0% | 15.8% | 27.6% | 23.1% | 24.6% | 23.6% | 19.6% |
| Commerce | -0.6% | -3.3% | -4.3% | -1.1% | 10.1% | 12.0% | 19.6% | 27.7% | 36.7% |
| Hotels | -4.2% | -9.6% | -13.4% | -4.4% | 0.3% | -2.6% | 1.1% | 1.4% | 2.5% |
| Transport | -0.1% | 0.9% | 2.3% | 12.3% | 24.1% | 29.3% | 38.5% | 48.1% | 53.2% |
| Finance | 7.7% | 19.3% | 28.6% | 49.4% | 51.1% | 68.0% | 99.7% | 139.4% | 197.4% |
| Real Estate | -1.2% | -3.8% | -5.0% | -4.4% | 4.0% | 2.8% | 3.7% | 5.0% | 7.0% |
| Public Adm. | -2.0% | -0.9% | -3.1% | -3.5% | -1.5% | 0.3% | 1.3% | 2.8% | 3.6% |
| Edu. & Health | -3.6% | -2.7% | -4.2% | -5.2% | -6.6% | -6.1% | -5.5% | -6.1% | -8.6% |
| Prs. Servs. | -0.4% | -2.6% | -3.5% | -1.9% | 2.5% | 0.3% | 0.5% | -0.9% | -1.1% |
| VAT | 5.8% | 2.8% | -5.1% | 2.9% | 16.5% | 19.9% | 27.4% | 31.6% | 25.5% |
| Import Taxes | 3.3% | 4.2% | 5.1% | 4.2% | 8.7% | 10.0% | 7.0% | 13.6% | 41.6% |

127.    While the 1993 series thus grew materially faster than the 2004 series for the Overlap Period as a whole (2005 – 2013), for most calendar years within the Overlap Period, and in particular for five of the six most recent of those calendar years (including 2013), the Manufactured Information presents a radically different, indeed implausible, picture.  In the imaginary world of the Manufactured Information, the purported 1993 series and the 2004 series grew at virtually identical rates from 2014 through 2022.  This is evident from Tables 3 and 4 below, which show what the Growth Rate Differentials would have been for 2014 through 2022 (annually and cumulatively,

---

[11] As in Table 1, the sectoral data in this column is for the first nine months of 2013 and Total GDP is the full year 2013 figure determined by the English Court and asserted by the Plaintiffs here.

46

as was done with Tables 1 and 2 above), if growth in the 1993 series were as depicted by the Manufactured Information.

128.    For total real GDP, Table 3 shows very small variability in annual Growth Rate Differentials, ranging from a negative 0.8% to a positive 0.6% during 2014-2022.  This is simply irreconcilable with Table 1, which shows annual Growth Rate Differentials ranging between negative 1.0% and positive 6.8% during 2005-2013.  Indeed, in two-thirds of the years covered by Table 1, but none of the years covered by Table 3, the annual Growth Rate Differential had an absolute value of 1.0% or more (usually much more).  The implausibly small Growth Rate Differentials for total GDP in Table 3 become preposterous when viewed sector-by-sector.

### TABLE 3

### Annual Growth Rate Differentials:
### Manufactured Information Minus
### Actual Real GDP Growth in Constant 2004 Prices

| Sector | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| **Total GDP** | **-0.1%** | **0.6%** | **0.1%** | **0.6%** | **-0.8%** | **-0.5%** | **0.2%** | **0.1%** |
| Agriculture | -0.4% | -0.2% | -0.1% | 0.9% | -0.9% | 0.5% | -0.2% | 0.5% |
| Fishing | 0.1% | 0.0% | 0.1% | 0.1% | -0.2% | 0.1% | -0.2% | -0.2% |
| Mining | 0.0% | -0.1% | 0.1% | 0.1% | -0.2% | 0.1% | -0.1% | 0.0% |
| Manufacturing | 0.2% | 0.5% | 0.1% | -0.1% | -0.4% | 1.8% | -0.9% | 0.6% |
| Utilities | 0.3% | -0.7% | 0.2% | 0.0% | -0.5% | -0.3% | 0.9% | -1.0% |
| Construction | -0.1% | -0.1% | 0.1% | 0.2% | -0.2% | 0.1% | -0.2% | 0.0% |
| Commerce | -0.1% | 0.1% | 0.3% | 0.4% | 0.0% | 0.1% | -0.3% | -0.1% |
| Hotels | -0.1% | -0.1% | 0.1% | 0.1% | -0.2% | 0.2% | -0.4% | -0.5% |
| Transport | 0.1% | 0.1% | -0.4% | 0.1% | -0.6% | 3.8% | -1.6% | -1.5% |
| Finance | 0.1% | -0.8% | 0.5% | 0.1% | -1.1% | 0.4% | 0.3% | -0.6% |
| Real Estate | -0.1% | 0.6% | -0.3% | 0.4% | 0.0% | 1.4% | -2.9% | -1.6% |
| Public Adm. | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Educ. & Health | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.7% | -0.7% | 0.0% |
| Personal Services | -0.3% | 0.0% | -0.2% | 0.2% | -0.2% | -2.5% | 1.7% | 1.3% |
| VAT | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Import Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

129.    As Table 4 exposes, the *cumulative* Growth Rate Differential for total GDP according to the Manufactured Information was a miniscule 0.1% for the eight years shown, compared to 27.5% for the nine years covered in Table 2 (or 22.8% for the first eight of those nine years).

130.    Plainly, then, the Republic has filed with this Court and the English Court (and also publicly released to market participants via its website) entirely fabricated data for 2014-2022.

### TABLE 4

#### Cumulative Growth Rate Differentials: Manufactured Information Minus Actual Real GDP Growth in Constant 2004 Prices

| Sector | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| **Total GDP** | **-0.1%** | **0.5%** | **0.6%** | **1.3%** | **0.4%** | **-0.1%** | **0.0%** | **0.1%** |
| Agriculture | -0.4% | -0.5% | -0.6% | 0.4% | -0.2% | 0.3% | 0.1% | 0.6% |
| Fishing | 0.1% | 0.0% | 0.1% | 0.3% | 0.1% | 0.2% | 0.1% | -0.1% |
| Mining | 0.0% | -0.1% | -0.1% | 0.1% | -0.1% | 0.0% | -0.1% | -0.1% |
| Manufacturing | 0.2% | 0.6% | 0.7% | 0.5% | 0.2% | 1.8% | 1.3% | 1.9% |
| Utilities | 0.3% | -0.4% | -0.1% | -0.2% | -0.7% | -1.0% | -0.2% | -1.3% |
| Construction | -0.1% | -0.1% | -0.1% | 0.1% | -0.1% | 0.0% | -0.1% | -0.1% |
| Commerce | -0.1% | 0.0% | 0.3% | 0.7% | 0.7% | 0.7% | 0.5% | 0.4% |
| Hotels | -0.1% | -0.1% | -0.1% | 0.1% | -0.1% | 0.2% | 0.0% | -0.3% |
| Transport | 0.1% | 0.2% | -0.1% | 0.0% | -0.6% | 3.5% | 2.3% | 1.0% |
| Finance | 0.1% | -0.7% | -0.3% | -0.2% | -1.4% | -1.0% | -0.7% | -1.3% |
| Real Estate | -0.1% | 0.6% | 0.3% | 0.8% | 0.8% | 2.3% | -0.5% | -2.3% |
| Public Adm. | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Educ. & Health | 0.0% | -0.1% | 0.0% | 0.1% | 0.1% | 0.8% | 0.1% | 0.1% |
| Personal Services | -0.3% | -0.3% | -0.5% | -0.3% | -0.5% | -2.8% | -2.4% | -1.6% |
| VAT | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Import Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

(c)    **The Manufactured Information Does Not Relieve the Republic of its Payment Obligations**

131.    In violation of the English Court's Order, the Republic published the Manufactured Information missing much of the detail and data it has normally provided when publishing Actual Real GDP.  For example, information that had historically been provided concerning quarterly estimates of GDP levels and growth rates, expenditure-side and production-side GDP, fixed domestic gross investment, global supply and demand and the implicit price index was missing from the Manufactured Information.  The absence of this information casts further doubt on the bona fides of the Manufactured Information.

132.    What is clear, however, is that the Manufactured Information is not the data called for by the terms of the contract—Actual Real GDP measured in constant 1993 prices.  As discussed above, it is directly at odds with Actual Real GDP measured in constant 1993 prices previously published by INDEC and is based upon the 2004 methodology, not the 1993 methodology.

133.    As the Republic has admitted in the English Litigation, the 2004 methodology is not an acceptable way to estimate Actual Real GDP measured in constant 1993 prices.  According to the Republic, the differences between the two series go beyond differences in prices and weights, and reflect the profound changes in the conceptual framework used to calculate the two series.  Thus, the Republic conceded, using the 2004 methodology to estimate Actual Real GDP measured in constant 1993 prices (as it has apparently done with the Manufactured Information) would not produce a meaningful estimate, meet minimum quality standards required of official statistics

from a national statistical institute, be grounded in INDEC's or international statistical methods or be sufficiently independent or robust.

**(d)    The Republic's Reliance on the Manufactured Information Represents a Further Breach of the Global Security**

134.    The Global Security requires Actual Real GDP measured in constant 1993 prices for the denominator of the Adjustment Provision.  As explained above, the Manufactured Information is not Actual Real GDP measured in constant 1993 prices.  To the extent that the Republic attempts to substitute the Manufactured Information for Actual Real GDP measured in constant 1993 prices, it has breached its obligation to perform calculations in accord with the Global Security, and it has attempted to modify the terms of the Global Security in violation of the Modifications Provision.

135.    The Republic has asserted that it cannot estimate Actual Real GDP measured in constant 1993 prices using the correct methodology because it discarded the necessary price data, model and related records, and because it does not have the necessary specialist and institutional knowledge.[12]  If so, then its failure to maintain the data, model and records is itself a breach of its obligations under the Global Security.  Implicit in its obligations to perform the annual calculations under the Global Securities and to publish each year's Actual Real GDP measured in constant 1993 prices is the obligation to maintain the necessary capabilities to produce that GDP figure.  Having failed to do so, the Republic has breached the Global Security, indeed

---

[12] According to the Republic, estimating Actual Real GDP measured in constant 1993 prices is, at this point, not the work of a statistical office such as INDEC, but instead more compatible with the work of an academic or consultant.

willfully so.  Since early 2014 the Republic has been well aware of the key challenges later raised in the 2013 US Litigation, the present case, and (successfully) the English Litigation, including whether Argentina needs to continue publication of the 1993 series after rebasing.  In the face of that, the Republic chose not only to refrain from publishing the 1993 series but also to destroy its records and resources for doing so.

136.     The Manufactured Information is not entitled to deference under the "binding effects" clause in the Global Security.  The clause does not cover any calculations by INDEC, only certain calculations by MECON, and is notably absent from the definition of "Actual Real GDP."  Nor does the clause permit the Republic to substitute the Manufactured Information for that called for by the contract, Actual Real GDP measured in constant 1993 prices, especially where as explained above the Manufactured Information is manifestly false.[13]  It would be particularly unjustified to give any deference to the Manufactured Information when, by the Republic's own admission, (i) INDEC did not have the data, model, knowledge and capacity necessary to estimate Actual Real GDP measured in constant 1993 prices, and (ii) the 2004 methodology the Republic used would not provide a meaningful estimate of Actual Real GDP measured in constant 1993 prices, meet the minimum quality standards required of official statistics from a national statistical institute, be grounded in INDEC's or international statistical methods, or be sufficiently independent or robust.

---

[13] *See Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 2021 WL 1177465, at *9 (S.D.N.Y. Mar. 29, 2021).

51

137.    Finally, the Global Security requires that the Republic make calculations as of the Calculation Date for each Reference Year, which means that the data for such calculations must be data that had been published by each Calculation Date—not data published years later in the context of litigation.  The Calculation Dates for Reference Years 2014 through 2022 are long past, for the most part by years.  The Republic breached its contractual obligations by failing to publish the contractually required data and perform the contractually mandated calculations by the Calculation Date.

## CLAIMS FOR RELIEF

### COUNT ONE
### (BY THE INDIVIDUAL HOLDERS)

138.    The Individual Holders repeat and re-allege the allegations of paragraphs 1 through 137.

139.    The Individual Holders have the right to bring suit for that portion of Payment Amounts due representing their respective interests in the Global Securities, and assert the claims set forth in this Count One, pursuant to Section 11 of the 2005 Global Security, Section 9 of the 2010 Global Security and Section 4.9 of the Indenture.

140.    The Republic has breached its contractual obligations under the Global Securities to the Individual Holders in at least four ways.

141.    *First*, the Republic breached the Modifications Provision of the Global Securities—Section 22 of the 2005 Global Security and Section 20 of the 2010 Global Security.  That provision requires that modifications to certain "Reserved

Matters," such as a "change [to] the method of calculation of the Payment Amounts," receive the consent of 75% of Holders.

142.    By jettisoning the yearly Adjustment Fractions set forth in the Global Securities for its extra-contractual constant adjustment fraction, the Republic changed the determination of Base Case GDP after a rebasing.  And, since Base Case GDP is a necessary input in the calculation of the Payment Amount under the Global Securities, the Republic's use of the constant fraction constitutes a "change [to] the method of calculation of the Payment Amounts."

143.    Separately, by purporting to substitute the Manufactured Information for Actual Real GDP measured in constant 1993 prices, the Republic has also changed a necessary input in the calculation of the Payment Amount under the Global Securities and its reliance on the Manufactured Information constitutes a "change [to] the method of calculation of the Payment Amounts."

144.    Applying a constant adjustment fraction and substituting the Manufactured Information for the data required by the contract both constitute Reserved Matters that required approval by at least 75% of Holders.

145.    However, the Republic never sought or obtained the consent of Holders to modify the Global Securities pursuant to the Modifications Provision (or otherwise) and replace the yearly Adjustment Fractions with the Republic's extra-contractual constant fraction or to replace Actual Real GDP measured in constant 1993 prices with the Manufactured Information.  It, therefore, breached the Global Securities' Modifications Provision.

146.    _Second_, the Republic breached its obligations to publish Actual Real GDP measured in constant 1993 prices by the Calculation Date and to perform the contractually-specified calculations.  The Global Securities anticipate that INDEC will publish Actual Real GDP measured in constant 1993 prices and INDEC could have done so.  INDEC is part of the Republic, the Republic told investors that it controlled INDEC and that INDEC would publish data called for by the Global Securities.  The Republic could have ensured that INDEC published Actual Real GDP measured in constant 1993 prices by the Calculation Date, and INDEC would have done so if the President had directed it to do so.  Likewise, the Global Securities anticipate the Republic will perform the contractually-specified calculations and required it to do so by the Calculation Date.

147.    Absent an obligation to publish Actual Real GDP measured in constant 1993 prices and perform the contractual calculations by the Calculation Date, the terms of the Securities would be nonsensical because there would be contractual formulas for payment conditions and amounts but no assurance that the inputs for such formulas would be available in a timely manner, let alone ever, or that the calculations mandated by those formulas would ever be performed.  Moreover, if Argentina has no obligation to publish Actual Real GDP or perform the contractual calculations at all, and the absence of that data or non-performance of those calculations means Holders have no entitlement to payment, then the Securities would have been valueless from the start, an absurd result.

148.    The Republic breached its obligations by not publishing Actual Real GDP measured in constant 1993 prices by the Calculation Date, and by not

calculating the Adjustment Fractions according to the contractual formula set forth in the Global Securities for each Reference Year.  In fact, the Republic discouraged INDEC from publishing the inputs necessary to perform the contractually-specified calculations to avoid its payment obligations.  Even worse, the Republic claims to have discarded the price data, model and related records necessary to generate Actual Real GDP measured in constant 1993 prices, rendering continued publication of the 1993 price series and continued performance of the contractually-specified calculations impossible.  The Manufactured Information upon which the Republic purports to now rely was not published by the relevant Calculation Dates and it is not the figure called for by the contractual formulas, Actual Real GDP measured in constant 1993 prices.

149.    *Third*, the Republic breached the covenant of good faith and fair dealing implied under New York law.  Under the implied obligation of good faith and fair dealing, the Republic may not: (1) engage in conduct that would have the effect of destroying or injuring Holder's right to receive the fruits of the contract, or (ii) violate a promise that a reasonable person in the position of a Holder would be justified in understanding was included.

150.    By (i) failing to continue, and, in fact, discouraging, timely publication of Actual Real GDP measured in constant 1993 prices where it could have, (ii) destroying the price data, model and related records necessary to generate Actual Real GDP measured in constant 1993 prices, (iii) adopting an extra-contractual constant adjustment fraction, (iv) failing to perform the contractually-required calculations, and (v) publishing and relying upon the Manufactured Information, the Republic destroyed Holders' right to receive Payment Amounts otherwise due under the contract.

151.    Likewise, Holders were justified in understanding that the Republic promised to continue, and not discourage, timely publication of Actual Real GDP measured in constant 1993 prices after a rebasing where doing so was necessary to avoid depriving Holders of a payment that was due.  Additionally, Holders were justified in understanding that the Republic would perform the calculations required by the Global Securities in accordance with their terms where failing to do so would deprive Holders of a payment that was due.  Holders were also justified in understanding that the Republic would not rely upon data that was not Actual Real GDP measured in constant 1993 prices, such as the Manufactured Information, to deprive them of payments otherwise due—particularly when the Republic acknowledged such information is not a meaningful estimate of Actual Real GDP measured in constant 1993 prices, did not meet the minimum quality standards required of official statistics from a national statistical institute, was not grounded in INDEC's or international statistical methods, and was not sufficiently independent or robust to deprive Holders of payments that were otherwise due.

152.    _Fourth_, under the prevention doctrine, the Republic may not: (1) do anything which will have the effect of destroying or injuring the right of Holders to receive the fruits of the contract or (2) act in such a way as to frustrate or prevent the occurrence of a condition precedent.

153.    The Republic's conduct—failing to timely publish, and in fact discouraging, publication of Actual Real GDP measured in constant 1993 prices where it could have; adopting an extra-contractual constant adjustment fraction; failing to perform the contractually-required calculations, purportedly discarding the price data,

model and related records necessary to generate Actual Real GDP measured in constant 1993 prices; and instead publishing and relying upon the Manufactured Information—had the effect of destroying, injuring, or impeding Holders' right to receive Payment Amounts otherwise due under the contract.

154.    The Republic has also taken the position that non-publication of Actual Real GDP measured in constant 1993 prices means the conditions for payment cannot be calculated in accord with the plain terms of the contract.  Thus, by failing to timely publish the data where it could have, the Republic has also acted in such a way as to frustrate or prevent the occurrence of a condition precedent.

155.    Because Argentina failed to timely publish Actual Real GDP measured in constant 1993 prices, the Individual Holders (and Trustee) are relieved of any obligation to rely upon the missing data to establish the Republic's payment obligations under the GDP Securities.

156.    In doing all of the above, Argentina breached the contract, failed to perform calculations as required by contractual terms, committed manifest error and acted arbitrarily, willfully, and in bad faith.  It knew that a payment would be due for 2013 if INDEC continued publication of Actual Real GDP measured in constant 1993 prices and it followed the plain language of the Global Securities, and such payment would have a significant negative impact on its foreign currency reserves and credit rating.  It knew that the natural and unavoidable consequence of failing to continue timely publication of Actual Real GDP measured in constant 1993 prices, discouraging INDEC from doing so, jettisoning the plain language of the Global Securities mandating the application of the yearly Adjustment Fractions, adopting its extra-

57

contractual constant fraction, failing to perform the calculations required by the Global Securities, and publishing and relying upon the Manufactured Information would be to frustrate the right of Holders to payment under the terms of the contract.

157.    If the Republic had not breached its contractual obligations, if INDEC had continued to timely publish Actual Real GDP measured in constant 1993 prices, and if the Republic had followed the plain terms of, and performed the calculations required by, the Global Securities, it would have been apparent that the payment conditions had been met and the Republic owed a Payment Amount for one or more Reference Years after 2013. Alternatively, if it was no longer possible for the Republic to publish Actual Real GDP measured in constant 1993 prices and apply the Adjustment Provision as written, then Base Case GDP is unadjusted when the Year of Base Prices changes, the remaining terms of the contract still apply, and the Republic owed a Payment Amount for one or more Reference Years after 2013. The Republic has breached its contractual obligations by failing to make such payments and it owes each of the Individual Holders that portion of the Payment Amounts due representing such Individual Holder's interest in the Global Securities.

## COUNT TWO
## (BY THE TRUSTEE)

158.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 157.

159.    As set forth above, Argentina breached its contractual obligations under the Global Securities in at least four ways.

160.    If the Republic had not breached its contractual obligations as set forth above, if INDEC had continued to publish Actual Real GDP measured in constant

1993 prices, and if the Republic had followed the plain terms of, and performed the calculations required by, the Global Securities, it would have been apparent that the payment conditions had been met and the Republic owed a Payment Amount for one or more Reference Years after 2013. Alternatively, if it was no longer possible for the Republic to publish Actual Real GDP measured in constant 1993 prices and apply the Adjustment Provision as written, then Base Case GDP is unadjusted when the Year of Base Prices changes, the remaining terms of the contract still apply, and the Republic owed a Payment Amount for one or more Reference Years after 2013. The Republic has breached its contractual obligations by failing to make such payments and it owes the Trustee the full Payment Amounts for such Reference Years.

## **PRAYER FOR RELIEF**

WHEREFORE, each Individual Holder requests the entry of a judgment against the Republic as follows:

(a) Awarding such Individual Holder a sum equal to that portion of the Payment Amount representing such Individual Holder's interest in the Global Securities for any Reference Years after 2013 for which the payment conditions would have been met but for the Republic's breaches, plus applicable pre-judgment interest through entry of judgment and post-judgment interest thereafter, as applicable; and

(b) Granting such Individual Holder such other relief as the Court deems just and proper.

WHEREFORE, the Trustee requests the entry of a judgment against the Republic as follows:

(a) Awarding the Trustee a sum equal to the Payment Amounts for any Reference Years after 2013 for which the payment conditions would have been met but for the Republic's breaches, plus applicable pre-judgment interest through entry of judgment and post-judgment interest thereafter, as applicable;

(b)     Awarding the Trustee, pursuant to Section 5.6(a) of the Indenture, "compensation as agreed between the Republic and the Trustee . . . and all documented expenses, disbursements and advances reasonably incurred . . . or made by or on behalf of [the Trustee] . . . in accordance with any provisions of [the] Indenture (including the compensation, documented expenses and disbursements reasonably incurred . . . of its counsel and of all agents and other persons not regularly in its employ)," plus applicable pre-judgment interest through entry of judgment and post-judgment interest thereafter, as applicable;

(c)     Awarding the Trustee, pursuant to Section 5.6(b) of the Indenture, a sum sufficient "to indemnify the Trustee . . . for, and to hold it harmless against, any loss, liability or expense incurred by the Trustee . . . arising out of or in connection with the acceptance or administration of [the] Indenture or the trusts [t]hereunder and its duties [t]hereunder, including the documented costs and expenses reasonably incurred . . . of defending itself against or investigating any claim of liability with respect to the foregoing," plus applicable pre-judgment interest through entry of judgment and post-judgment interest thereafter, as applicable;

(d)     Awarding the Trustee, pursuant to Section 4.4(a) of the Indenture, a sum "sufficient to cover the [Trustee's] documented costs and expenses of collection and other liabilities reasonably incurred, including reasonable compensation to the Trustee and . . . [its] agents, attorneys and counsel, and any documented expenses and liabilities reasonably incurred, and all documented advances reasonably made, by the Trustee," plus applicable pre-judgment interest through entry of judgment and post-judgment interest thereafter, as applicable; and

(e)     Granting the Trustee such other relief as the Court deems just and proper.

Dated:   New York, New York
        October 22, 2024

FRIEDMAN KAPLAN SEILER
ADELMAN & ROBBINS LLP


By:___*/s/ Edward A. Friedman*_____
      Edward A. Friedman
      Daniel B. Rapport
      Michael S. Palmieri
7 Times Square
New York, New York 10036
(212) 833-1100

*Attorneys for Plaintiffs and Individual
Holders Aurelius Capital Master, Ltd.;
ACP Master, Ltd.; and Aurelius
Opportunities Fund, LLC and Plaintiff
The Bank of New York Mellon*, *solely in
its capacity as Trustee*


LATHAM & WATKINS LLP



By:___*/s/ Matthew S. Salerno*___
      Matthew S. Salerno
      Ryan M. Schachne
1271 Ave. of the Americas
New York, New York 10020
(212) 906-1200

*Attorneys for Plaintiffs and Individual
Holders Adona LLC, Egoz I LLC, Egoz
II LLC, Mastergen, LLC, Erythrina,
LLC, AP 2016 1, LLC, AP 2014 3A,
LLC, AP 2014 2, LLC, WASO Holding
Corporation, Two Seas Global (Master)
Fund LP, and Virtual Emerald
International Ltd.*

PERKINS COIE LLP


By:___*/s/ Matthew M. Riccardi*_____
      Matthew M. Riccardi
      H. Rowan Gaither IV
1155 Ave. of the Americas, 22nd Floor
New York, New York 10036-2711
(212) 530-1800

*Attorneys for Plaintiff and Individual
 Holder 683 Capital Partners, LP*